MUTUAL RESERVE FUND LIFE ASS'N v. CLEVELAND WOOLEN MILLS.

PARKER v. SAME.

(Circuit Court of Appeals, Sixth Circuit. October 11, 1897.)

Nos. 488, 489.

1. INSURANCE—ILLEGAL STIPULATIONS—PUBLIC POLICY.
A stipulation in a policy of life insurance that no suit in law or in equity shall be brought upon it except in the circuit court of the United States is contrary to public policy, and invalid.

2. SERVICE OF PROCESS—FOREIGN CORPORATIONS—RESIDENT AGENTS.
By Laws Tenn. 1875, c. 66, § 2, certain foreign corporations are required to file with a state officer a power of attorney authorizing the acknowledgment of service of process in behalf of said corporations in suit against them. Held, that this does not prevent serving them with process in the ordinary way where they have a resident agent, but provides an additional mode of obtaining jurisdiction.

3. LIFE INSURANCE—FORFEITURE—NONPAYMENT OF ASSESSMENTS.
Under the law of New York, nonpayment of an assessment on a life insurance certificate or policy operates as a forfeiture without any formal affirmative action by the association after the expiration of the credit stipulated by the contract and formal notice of the assessment.

4. SAME—WAIVER OF CONDITIONS BY PAROL.
An agreement in the terms of a policy that no change or alteration thereof shall be valid unless in writing may itself be changed by a parol agreement made in behalf of the company by a general officer, such as its secretary.

5. SAME—FORFEITURES.
Where the parol representations of an insurance company, made through its secretary to an assignee of a policy, are such as to induce the latter to omit strict performance through tenders of premiums, it would be inequitable to permit the company to exact a forfeiture due to its failure to comply with such representations.

6. SAME—WAIVER BY AGREEMENT WITH ASSIGNEE—EFFECT AS TO BENEFICIARY.
An agreement of an insurance company with the assignee of a policy, who holds it as security for a debt, to continue the policy in force after any default by the assured, and give the assignee an opportunity to pay the assessment, is operative as to the entire policy, and for the benefit of all who should be concerned, including the interest of the beneficiary in the surplus above the debt due to the assignee.

7. SAME—ASSIGNMENT OF POLICY BY BENEFICIARY—ACKNOWLEDGMENT.
A policy of insurance was issued to a resident of Tennessee. He assigned it in that state, and his wife signed a consent upon the assignment. Held, that her refusal to acknowledge her signature before a notary did not in itself invalidate the assignment.

8. SAME—ASSIGNMENT BY INSURED.
A certificate of insurance issued by an association organized under Laws N. Y. 1883, c. 175, and engaged in conducting an insurance business on the

co-operative or assessment plan, may, under section 18 thereof, be assigned by the assured without the consent of payees or beneficiaries having no vested right therein.

9. PLEADING—IMMATERIAL ISSUES.

The fact that a defendant takes issue, in his answer, upon an immaterial question of fact, does not prevent him from insisting at the trial that the allegation thus denied is immaterial.

Appeals from the Circuit Court of the United States for the Eastern District of Tennessee.

In 1885, John H. Parker, of Cleveland, Bradley county, Tenn., was received as a member of a co-operative and assessment insurance association, incorporated under chapter 175 of the Laws of 1883 of the state of New York, under the corporate name of the Mutual Reserve Fund Life Association, and having its principal office in the city of New York. The policy or certificate of insurance was for the sum of $10,000, and was payable to Mary K. Parker, wife of the insured. In January, 1890, this policy, as we shall hereafter designate it, was assigned by a writing indorsed thereon to the Cleveland Woolen Mills, a corporation of the state of Tennessee, for a recited consideration of $10,000, though the real intent of the assignment was to secure to the Woolen Mills Company a large sum of money then due and owing to it by the assured. This assignment was by both Parker and his wife, and the genuine signatures of both appear thereon. On the 6th day of March, 1891, the association indorsed its consent to this assignment. Parker continued thereafter to pay the assessments made upon him until March 3, 1893, when a default occurred by a failure to pay mortuary call No. 66, which was due and payable on that day. This default appears to have been accidental, inasmuch as a fund was kept on deposit in a bank at Cleveland for the purpose of meeting such calls. By oversight, payment of this assessment was omitted until March 18, 1893, when a draft for the necessary amount was remitted by the Cleveland National Bank, in a letter stating that money had been deposited with the bank "to pay premium before due, but was overlooked at proper date." To this letter from the bank, the association replied, by letter addressed to John H. Parker, as follows: "Dear Sir: We have to acknowledge receipt at this office of your remittance of $25.70, to be applied upon your policy 27,542, under call 66, and that of Mrs. Mary K. Parker, 88,-772, amounting to $10.65. This amount has been placed in the suspense account by reason of the fact that the remittance was not in transit until March 18th, and the thirty days allowed for the payment of call expired March 3d. We will require satisfactory application for reinstatement and certificate of health, blank for which purpose we inclose you herewith. In the meantime we are holding your remittance in suspense account, awaiting this information, or the money will be returned to you as you direct." Mr. Parker's health had failed when this default occurred, and he declined to submit to a medical examination; but, as future assessments were made, he caused remittances to be made by his banker for the purpose of meeting them. Call No. 67 was made March 13, 1893; No. 68, May 1, 1893; No. 69, July 19, 1893; and No. 70, September 16, 1893. In response to letters remitting funds for their payment, replies were received stating that the money had been placed "in suspense account," with that of call 66, and was held subject to Parker's order "or satisfactory medical examination." On November 10, 1893, a draft covering these four remittances was remitted by express to the Cleveland National Bank, which that bank declined to receive; and, on the same day, Mr. Parker was notified of this return of his money, and that the time had expired within which he might be reinstated on medical examination. The Cleveland Woolen Mills, becoming aware of the claim of the association that the policy had lapsed by nonpayment of call No. 66, filed an original bill in the state chancery court for the county of Bradley, October 1, 1894, to which it made defendants the said John H. Parker and wife, Mary K. Parker, and the Mutual Reserve Fund Life Association, for the purpose of having said policy reinstated, and its rights as assignee protected. This bill averred that when it applied, March 6, 1891, to obtain the consent of said association to

the assignment of said policy, it also asked that notices of assessments, as made from time to time, be sent to it, that it might arrange for the payment thereof in case the assured was unable to make such payments; that the association declined to do this, but agreed that, if Parker should make default, notice should at once be given the assignee, that it might pay the call and avoid forfeiture. The bill further averred that no notice of the failure of Parker to pay call No. 66 had been given according to this agreement, and that the company had fraudulently concealed from the complainant all knowledge of Parker's default, and was now claiming that the policy had lapsed. The bill tendered payment of any assessments not covered by the remittances theretofore made by the assured. At this stage of the cause, the Mutual Reserve Fund Life Association appeared and removed the suit to the circuit court of the United States. Before answers were filed, John H. Parker died; whereupon the Woolen Mills Company filed an amended and supplemental bill, averring this fact, and claiming payment of the policy. Mrs. Parker answered, and filed a cross bill against the Woolen Mills Company and the Insurance Association, setting out the facts heretofore stated, and averring that her signature and consent to the assignment of the policy had been obtained from her by the undue influence and coercion of her husband, and praying that the said Woolen Mills Company might be decreed to hold the proceeds of the policy, when collected, in trust for her use and benefit. Upon a final hearing, the circuit court decreed in favor of the Woolen Mills Company, and ordered that any surplus after the payment of the debt due by the assured to it should be held for and paid over to Mrs. Parker, From this decree both the Mutual Reserve Fund Life Association and Mrs. Mary K. Parker have appealed, and separately assigned error.

Theo. Richmond, for Mutual Reserve Fund Life Ass'n.

Frank Spurlock and Creed Bates, for Mary K. Parker.

J. B. Sizer and Tomlinson Fort, for Cleveland Woolen Mills.

Before TAFT and LURTON, Circuit Judges, and BARR, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

The first error assigned by the Mutual Reserve Fund Life Association is as to the action of the court in overruling a plea in abatement to the jurisdiction of the state court. The policy issued to John H. Parker contained a stipulation that no suit in law or equity should be brought upon it except in the circuit court of the United States. This provision intended to oust the jurisdiction of all state courts is clearly invalid. Any stipulation between contracting parties distinguishing between the different courts of the country is contrary to public policy, and should not be enforced. Nute v. Insurance Co., 6 Gray, 174; Amesbury v. Insurance Co., Id. 596; Reichard v. Insurance Co., 31 Mo. 518; Beach, Ins. § 1272; Bac. Ben. Soc. § 443; Insurance Co. v. Routledge, 7 Ind. 25; Steam-Shipping Co. v. Lehman, 39 Fed. 704; Slocum v. Assurance Co., 42 Fed. 235; Scott v. Avery, 5 H. L. Cas. 811, 839–844. The process by which the appellant association was brought into court was served upon the local agent representing the association at Cleveland, Tenn. The association also pleaded in abatement that it was a corporation of another state, doing business in Tennessee in accordance with chapter 66 of the Tennessee Acts of 1875, and that by section 12 of that act all such companies were required to file with the insurance commissioner of the state a power of attorney, authorizing the secretary of state to ac-

knowledge service of process for and in behalf of said companies in suits brought against them in the courts of the state. The contention of the appellant is, that as it had complied with this law, no process could be lawfully served upon its agents or officers, and this suit could only be brought by process served on the secretary of state. This section has not been construed by the supreme court of Tennessee. By sections 3516 and 3539, Rev. Code Tenn. (Mill. & V.), general provision is made for the service of process upon the resident agents of corporations in all actions growing out of the business of the corporation. Though foreign corporations are not specifically mentioned in these sections, yet they have been construed as conferring the right to commence a suit against a foreign corporation, doing business within the state, by service of process on any agent resident in the county where the suit was brought. By the third section of chapter 226, Tenn. Acts 1887, it was provided that process might be served "upon any agent" of a foreign corporation found within the county where the suit was brought. This act was construed as intending to enlarge, and not limit, the jurisdiction over such companies. Telephone Co. v. Turner, 88 Tenn. 265, 12 S. W. 544. We think a like construction should be given to section 12 of chapter 66 of the Acts of 1875. It was not the purpose of that provision to prevent such corporations from being served with process in the ordinary way where they have a resident agent, but to provide an additional mode of obtaining jurisdiction which might be available if such company had no resident agent. The plea in abatement was properly overruled.

The second, third, fourth, and fifth assignments of error may be grouped and considered together. They present the question as to whether the policy on the life of John H. Parker had lapsed or terminated by failure to pay mortuary call No. 66 within 30 days from February 1, 1893. Waiving any question as to the sufficiency of the notice of that call under the legislation of the state of New York, it is sufficiently established that a notice was received of that assessment, and that, under the stipulations of the policy, call No. 66 was due and payable March 3, 1893. This call was not paid or offered to be paid until March 18, 1893. The policy provided that the failure to pay any mortuary call within 30 days after notice should terminate the policy, and all former payments be forfeited to the association. Nonpayment operated as a forfeiture without any formal affirmative action by the association after the expiration of the credit stipulated by the contract and formal notice of the assessment. This seems to be well settled by the law of the state of New York, by which law this contract must be construed. Roehner v. Insurance Co., 63 N. Y. 160; Robertson v. Insurance Co., 88 N. Y. 541; Fowler v. Insurance Co., 116 N. Y. 389, 22 N. E. 576. To meet this claim of forfeiture, the assignee of the policy, the Cleveland Woolen Mills, relies upon an agreement, which, it alleges, was made with it by the association, whereby the latter company agreed to give notice of any default by Parker in the payment of future assessments to the assignee, and allow payments by the assignee after such notice. In

March, 1891, the mill company sent Mr. F. T. Hardwick to New York for the purpose of obtaining the consent of the insurance association to the assignment of the Parker policy, and to make some arrangement touching the payment of future assessments. Hardwick went to the general office, and, after some explanation of the object of his visit, was referred to Mr. J. M. Stevenson, assistant secretary of the association, as the proper officer to confer with. The witness Hardwick says he had some difficulty in getting the company to consent to the assignment, because not upon their printed blanks, and not in the form in which they were in the habit of requiring such assignments. The matter of consenting to the assignment was taken under consideration by Mr. Stevenson, with the statement that he would confer with the counsel for the association. Upon Mr. Hardwick's third visit to the office, he succeeded in obtaining the consent he desired. This consent was indorsed on the policy by Mr. Stevenson, and signed by him as assistant secretary. With reference to the payment of future assessments, the witness says he asked "that notices of the maturity of assessments be sent to the mill company, so that they could pay the premium in case Parker did not," but that Stevenson "declined to send two such notices, but said they would send notices as usual to Parker, and, if he defaulted in the payment, they would notify the mill people, and they could pay, and after that time the notices would be sent to the mill people regularly." Hardwick says he asked to have this agreement put in writing, but that Stevenson declined, "saying, in substance, that this was a courtesy which they always showed their policy holders." He says, further, that he (Hardwick) "expressed some concern, and he (Stevenson) assured him that the mill people should have an opportunity to pay the premiums." "His manner was so reassuring that I relied on it, and came away feeling that they would do so." This whole matter of agreeing to give the mill company an opportunity of paying, or giving it notice, after a default should be made by Parker, is substantially denied by Stevenson. Hardwick and Stevenson were the only persons present, and the character of neither is in any way assailed. Neither is personally interested. Which shall be credited? The learned judge who heard the cause on the circuit accepted the statement of Mr. Hardwick, and we are disposed to likewise do so. The reasons which move us in this regard are these: Mr. Stevenson seems to testify more from his usual course of business than from a clear recollection. Doubting his authority to make such an arrangement, he is disposed to think he did not. On the other hand, Mr. Hardwick is clear and positive. The mill company had another policy in another company, which had been transferred by Parker to it, and Hardwick was also charged with the duty of obtaining from this other company a like consent to the assignment and an arrangement by which the policy could be kept up. This other company agreed to draw on the mill company for its premiums on the day due, unless previously paid by Parker. This arrangement was communicated to Stevenson, who, Hardwick says, "assured me that his company was quite as liberal to its policy holders as that or

any other good company." But, more than all, the subsequent conduct of the mill company impresses us with the belief that they were relying upon the arrangement testified to by Hardwick. In order to guard against a lapse of the policy by failure of Parker to pay future assessments, Mr. Hardwick was instructed to arrange with a New York city bank, in case the insurance company refused any arrangement for notices of assessments, to keep a deposit with it, and to have the bank tender payment "on or about the last day on which a premium could be paid without allowing the policy to lapse." This proposed arrangement was not carried out, says the president of the company, "because this agreement with Mr. Stevenson was reported to them by their agent, Mr. Hardwick." This failure to carry out this preconcerted plan, by which the assignee could have been protected, or to take any other steps in that direction, tends to confirm us in the opinion that Mr. Hardwick's memory is the more to be relied on. But it has been insisted that Stevenson had no authority to make the arrangement he did. This argument is based chiefly on the fourth paragraph of the policy, which is in these words:

"(4) No agent of the association has authority to make, alter, or discharge contracts, waive forfeitures, extend credit, or grant permits; and no alteration of the terms of this contract shall be valid, and no forfeiture thereunder shall be waived, unless such alteration or waiver shall be in writing, and signed by the president and one other officer of the association."

In addition to this clause in the contract itself, appellant refers to and points out certain provisions of the by laws of the association providing for an executive committee of the directors, and prescribing in general terms the duties of the secretary. In respect to these by-laws, it is enough to say that nothing in them operates as an express limitation upon the authority of the secretary as a general officer to extend credit, as was done in this instance. Neither is there anything in the charter of the association or the general laws of New York which peculiarly bears upon the authority of such a general officer of a corporation as its secretary or assistant. Neither a contract of insurance nor any change or alteration thereof need be in writing. Trustees First Baptist Church v. Brooklyn Fire Ins. Co., 19 N. Y. 305; Insurance Co. v. Shaw, 94 U. S. 574; Insurance Co. v. Norton, 96 U. S. 234. Neither is it competent for the parties to disqualify themselves from ability to agree by parol to any contract which, under the law, need not be in writing, and an agreement in the terms of a policy that no change or alteration thereof shall be valid unless in writing indorsed thereon may itself be charged by parol. "Parties to contracts cannot disable themselves from making any contract allowed by law in any mode in which the law allows a contract to be made. A written contract can be changed by parol, and a parol one changed by writing, despite any provision in the contract to the contrary." Insurance Co. v. Norwood, 32 U. S. App. 490–499, 16 C. C. A. 136, and 69 Fed. 71; Insurance Co. v. McCrea, 8 Lea, 513; Dale v. Insurance Co., 95 Tenn. 38–48, 31 S. W. 266; Pechner v. Insurance Co., 65 N. Y. 195. "A written bargain is of no higher legal degree than a parol one. Either may vary or discharge

82 F.—33

the other, and there can be no more force in an agreement in writing not to agree by parol than in a parol agreement not to agree in writing. Every such agreement is ended by the new one which contradicts it." Insurance Co. v. Earle, 33 Mich. 143, 153.

There is nothing in the charter of this association, nor in the statute law of New York, disabling this association from making any alteration in the terms of this contract in respect to extension of credit or waiver of forfeiture which it might see fit to make. It follows, therefore, that the association might agree to an extension of credit in respect to either annual dues or mortuary assessments if it saw fit. Parol agreements, very general in their terms, for an extension of credit in the payment of dues, premiums, and assessments to insurance companies, both life and fire, have been upheld by the courts of the state of New York. In Howell v. Insurance Co., 44 N. Y. 276, 285, there was evidence as to an agreement between the insurance company and the assured at the time of the payment of the first annual premium; that thereafter, "if anything should happen to the assured to prevent his paying such premium on the day whereon the same became payable, the said policy should not thereby become null and void, but should continue in full force for a reasonable time thereafter, so that the said premium could be paid." The assured died while one annual premium was due and unpaid, and a tender was made of this premium within a reasonable time after the death of the assured. Concerning the legal effect of this evidence, the court of appeals of New York said:

"It was not an agreement that the policy might be revived after it had become forfeited and become null and void. It was an agreement to continue the policy in force after the 15th of July in any year, for a reasonable time, to enable the premium to be paid. Instead of requiring prepayment of the premium, it gave a credit for a reasonable time. It was not an agreement which would allow an insurance upon the life of a dead man, but it continued the policy in force, so that there was no forfeiture of the policy or termination of the insurance, provided that payment was made within a reasonable time, no matter whether the person whose life was insured was dead or alive. Hence, if there was no other agreement than the one here alluded to, there could be no reason for saying that the policy was not in force at the time of the death of Mr. Howell."

In Dilleber v. Insurance Co., 76 N. Y. 567, 572, 573, a forfeiture for nonpayment of a premium was insisted upon. For the plaintiff there was evidence that in April, 1860, the assured went to the general office, and found there a general agent of the company and its president, and said to them "that he wanted to give up his policy, that he could not pay it"; that thereupon one or both of these officers said: "You cannot; you must not give up this policy, Mr. Dilleber; you must keep it alive. If you can't pay it when it becomes due, we will give you what accommodation is necessary." During the next 15 years the assured paid his annual premiums, sometimes by note and sometimes by cash, but with no uniform regard to the day of maturity. His premium for 1875 fell due December 22, 1875, and was tendered December 24th, and refused, and the assured died January 1, 1876. This evidence was held competent, notwithstanding the policy contained a provision that any consent or agree-

ment whatever not signed by the president and secretary, and bearing the seal of the company, which affected the terms of the policy, should be void. As to this agreement the court said:

"The evidence was competent for the consideration of the jury, and not insufficient to sustain the verdict. In the first place, the parties representing the defendant upon that occasion were the president and general agent of the company, and must be held to have had ample authority to make such an agreement as the plaintiff relies on. In Bliss on Life Insurance (section 275) it is said: 'The company will be bound by the acts of the president and secretary performed in its office, whether such acts are in writing or verbal, whether they make a contract, waive a forfeiture, or give a consent;' and so are the adjudged cases. Trustees First Baptist Church v. Brooklyn Fire Ins. Co., 19 N. Y. 305; Id., 28 N. Y. 153; Howell v. Insurance Co., 44 N. Y. 276; Marcus v. Insurance Co., 68 N. Y. 625; Leslie v. Insurance Co., 63 N. Y. 27. In the next place, it was proper to show this arrangement by parol, notwithstanding the language of the policy in regard to a writing. Carroll v. Insurance Co., 10 Abb. Prac. (N. S.) 166; Kolgers v. Insurance Co., Id. 176; Howell v. Insurance Co., 44 N. Y. 285. In consequence of it, the insured yielded to the request of the officers of the defendant, consented to retain the policy; and by virtue of it the company then received his promissory note, which they afterwards collected, and for each one of fourteen years received with more or less regularity the stipulated premium upon the policy. Therefore the agreement was supported by a sufficient consideration. Bodine v. Insurance Co., 51 N. Y. 117; Dean v. Insurance Co., 62 N. Y. 642; Howell v. Insurance Co., 44 N. Y. 276. Standing by itself, it fairly permitted a conclusion that the arrangement then made related to the entire life of the policy, or until such earlier time as the defendant should notify the insured that the parol agreement must end, and in the future the condition as written in the policy be strictly complied with. Trustees First Baptist Church v. Brooklyn Fire Ins. Co., 28 N. Y. 153. Indeed, it is not easy to see what other inference could be drawn from it. The words of the officers of the company can hardly be limited to the payment of a premium then four months past due, or to the note given on that occasion, for that was put in suit in September next after it was given, or to the next succeeding premium, but they apply rather to the policy as an instrument to be 'kept alive' or in force from year to year, notwithstanding delay in payment of premiums. This conclusion is very much strengthened by inferences fairly to be drawn from the conduct of the parties. It may well be inferred that the company had waived a strict compliance with their written contract, and they also aid in the proper construction of the agreements of the parties made in April, 1860. Indeed, the conduct of both parties from the time of that transaction seems to indicate that they regarded it as part of the arrangement of insurance, and the insured was not in fault in trusting to its continuance. The company was bound by it, and could not, in good faith, insist upon a strict compliance with the condition of payment until, before a premium became due, they gave the insured notice that they should exact it. Common fairness required so much. They cannot, when their own interest seems to demand it, waive a condition, and, after reliance upon it by the insured, withdraw the waiver without notice. The arrangement proven is not unlike that conceded to have been made in the case of Howell against this defendant (44 N. Y. 283), and which was found sufficient to uphold a verdict.

There remains only the question as to whether the agreement made by Mr. Stevenson is to be regarded as an agreement made by the corporation. As to the effect of the clause restricting the authority of agents of the association, it is clear that that does not embrace general agents or general officers. Bac. Ben. Soc. § 426; Association v. Stapp, 77 Tex. 517–523, 14 S. W. 168; Marcus v. Insurance Co., 68 N. Y. 626; Hastings v. Insurance Co., 138 N. Y. 473–479, 34 N. E. 289. In the case last cited, the defense was that the policy was not

in force at death of assured, by reason of the nonpayment of a premium. To meet this, evidence was offered of a conversation between the secretary of the company and assured, in which the secretary said to the assured, who was one of its medical examiners, that the company would carry him and give him credit for premiums due and to become due thereafter. The trial court thought as this promise was made by the secretary when not in or at the general office of the company, but while in another state, that he had no power to bind his company. To this the court of appeals said:

"We cannot concur in this view. The secretary is one of the general managing agents of a corporation, and, when in the discharge of the duties of his office, he represents the corporation itself. To waive prompt payment of a premium about to fall due is an act within the general powers of the secretary of a life insurance company. The president or other general officer of a corporation has power, prima facie, to do any act which the directors could authorize or ratify. Conover v. Insurance Co., 1 N. Y. 290; Booth v. Bank, 50 N. Y. 396; Leslie v. Lorillard, 110 N. Y. 519, 18 N. E. 363; Holmes v. Willard, 125 N. Y. 75, 25 N. E. 1083; Patterson v. Robinson. 116 N. Y. 193, 22 N. E. 372; Rathbun v. Snow, 123 N. Y. 343, 25 N. E. 379; Railroad Co. v. Dixon, 114 N. Y. 80, 21 N. E. 110; Mor. Priv. Corp. §§ 251–253. There was no reason, and we are not referred to any controlling authority, for holding that the valid exercise of his powers depends upon the particular place where he may be at the time. The true test of his authority to bind the corporation is not whether he acts in the general office or in a distant state, but whether, at the time, he is engaged in the discharge of the general duties of his office, and in the business of the corporation."

See, also, Steen v. Insurance Co., 89 N. Y. 315.

The New York cases are not peculiar in respect of the validity to be attached to agreements by a general agent changing the express terms of a policy of insurance by parol. Of the many cases dealing with this question, and in line with those cited from New York, we need cite but the following: Insurance Co. v. Norton, 96 U. S. 234; Insurance Co. v. Unsell, 144 U. S. 439–449, 12 Sup. Ct. 671; Insurance Co. v. Norwood, 32 U. S. App. 490, 16 C. C. A. 136, and 69 Fed. 71; Insurance Co. v. Earle, 33 Mich. 153; Insurance Co. v. McCrea, 8 Lea, 513; Dale v. Insurance Co., 95 Tenn. 38, 31 S. W. 266. See, also, Bac. Ben. Soc. § 426.

In Insurance Co. v. Unsell, cited above, an agreement for indulgence in prompt payment of premiums was sought to be made out by the general conduct of the company in dealing with the assured. Justice Harlan adopts the language of Justice Bradley in Insurance Co. v. Eggleston, 96 U. S. 577, where it was said by Justice Bradley, in speaking for the court:

"We have recently, in the case of Insurance Co. v. Norton, 96 U. S. 234, shown that forfeitures are not favored in the law, and that courts are always prompt to seize hold of any circumstances that indicate an election to waive a forfeiture, or any agreement to do so on which the party has relied and acted. Any agreement, declaration, or course of action on the part of an insurance company which leads a party insured honestly to believe that, by conforming thereto, a forfeiture of his policy will not be incurred, followed by due conformity on his part, will and ought to estop the company from insisting upon the forfeiture, though it might be claimed under the express letter of the contract. The company is thereby estopped from enforcing the forfeiture."

Returning to the facts of the case at bar touching an extension of credit, what the secretary said was in substance this:

"We will continue to send notices to Parker, and cannot undertake to send you notices also. But, if Parker fails to pay any assessment, we will extend the time within which such assessment can be paid long enough to give you notice and an opportunity to pay in a reasonable time, and thereafter we will send notices of calls to you."

Aside from any weight to be attached to this as an agreement for an extension of credit under certain circumstances, it would operate as a fraud to permit an assertion of a forfeiture under the facts of this case. The assignee could have guarded against a lapse of the policy by making tenders from time to time through a New York bank, and Hardwick was instructed to make such an arrangement in default of some agreement for its protection with the insurance company. Relying upon the arrangement made with the secretary of the company at its general office, no other arrangement was made. To repudiate this agreement would now defeat the policy. The act of the association through Stevenson has induced the assignee to omit strict performance through tenders made by an agent. Under such circumstances it would be inequitable to permit the forfeiture to be exacted. Leslie v. Insurance Co., 63 N. Y. 27, 33; Pratt v. Insurance Co., 55 N. Y. 505, 511; Pitney v. Insurance Co., 65 N. Y. 6, 22; Bridger v. Goldsmith, 143 N. Y. 424, 38 N. E. 458; Insurance Co. v. Norwood, 32 U. S. App. 490, 16 C. C. A. 136, and 69 Fed. 71; Insurance Co. v. Eggleston, 96 U. S. 577; Insurance Co. v. Norton, Id. 234; Insurance Co. v. Unsell, 144 U. S. 439, 12 Sup. Ct. 671.

The debt due from Parker to the woolen-mills company is now less than the amount of the policy held as collateral, and it is assigned as error that the assignee should be allowed a decree against the company for any greater sum than the debt remaining unpaid. The policy itself provides that an assignee of a policy who holds as a creditor can recover only to the extent of his bona fide indebtedness. It is a mistake to assume that the assignee has been allowed as a creditor to recover any greater sum than the remainder of its indebtedness. The legal title of the policy is in the woolen-mills company, and the decree provides that the surplus shall be held in trust for Mrs. Mary K. Parker, the original beneficiary, who is also a party to the litigation. Unless the insurance company is injured, we cannot see how it can complain; and it is not injured if it is liable to Mrs. Parker for so much of the policy as is not consumed in the payment of Mr. Parker's debt. The contention is, that as between the insurance company and Mrs. Parker, the policy has lapsed. There is nothing in this. The agreement with the assignee to continue the policy in force until it could pay any assessment which Parker failed to pay operated to keep the contract of insurance alive as to the entire policy, and for the benefit of all who should be concerned. The money due on the call due March 3, 1893, and all subsequent calls, was tendered to the company, and is still in its hands, subject to its disposition, or was tendered by this bill. The policy was therefore in force when the assured died, and the decree has been so molded

as to protect Mrs. Parker as beneficiary of the surplus and the insurer against further liability to her.

We come now to the cross appeal of Mrs. Mary K. Parker, and the assignment of errors in her behalf. Mrs. Parker's cross bill was filed for the purpose of setting up her title, upon the ground that her signature and consent to the assignment thereof had been procured by undue influence and coercion. Her insistence is that the woolen-mills company, for the purpose of obtaining payment of the debt due by her husband, claimed that the debt was criminally incurred by a misappropriation of the assets of the company under his control as the treasurer of the corporation; that her husband, under fear of prosecution, made the assignment, and, by representations to her that they would be ruined if she refused to join him in the assignment, obtained her signature thereto. She further charges that she was to acknowledge the assignment privily before a notary public, and understood that until she did so the assignment was incomplete and invalid. It is further charged and shown that, after Mr. Parker and his wife had signed the assignment of the policy indorsed therein, it was delivered to the assignee, who subsequently sent a notary to take her acknowledgment. The cross bill then alleges that, having recovered from her fright, she refused to acknowledge her signature, and demanded that the policy should be returned to her, which demand was refused. Her prayer is that the said woolen mills be decreed to hold any recovery against the insurance association in trust for her benefit. The assignment of an insurance policy, in which a married woman is the beneficiary, may be made without privy examination, such as is necessary under the law of Tennessee to convey title to the land of a married woman. Scobey v. Waters, 10 Lea, 551, 563; Webster v. Helm, 93 Tenn. 322, 24 S. W. 488. Her refusal to acknowledge her assignment before a notary public does not in itself invalidate it. We are not prepared to admit that the allegations of the cross bill nor the evidence bearing upon her assignment are sufficient to make out a case of either undue influence or coercion. The claim against John H. Parker was for a shortage in his accounts as treasurer of the corporation, of which he was an officer. That her husband feared prosecution is likely, but that the officers of the corporation threatened him with prosecution or contemplated criminal proceedings is not satisfactorily established. That his wife, under the circumstances, should be moved to aid him in settling such a debt, and that he alarmed her by expressing his fears of prosecution, hardly makes a case of coercion or undue influence. That she was actuated by compassion for her husband, and moved by her love for him and anxiety on his account, is probable. But we are not prepared to say that she has made out a case of legal coercion or duress, or one which would justify a court in holding that she did not act freely and understandingly. But, aside from this, we are of opinion that her consent was not essential to the assignment of this policy. The association issuing this policy was organized under chapter 175 of the New York Acts of 1883, and was engaged in conducting an insurance business on the co-operative or assessment plan. Rev. St. N. Y. (8th Ed.)

p. 1704; Laws 1883, c. 175. By section 18 of that act it is provided as follows:

"Membership in any such corporation, association or society shall give to any member thereof the right, at any time, with the consent of such corporation, association or society, to make a change in his payee or payees, or beneficiary or beneficiaries, without requiring the consent of such payees or beneficiaries." Rev. St. N. Y. (8th Ed.) p. 1709.

Mrs. Parker had no vested interest in this policy, and the assured, under this provision of the law governing this contract, had the right to change the beneficiary. There was no contract between the member and payee by which any interest was vested in Mrs. Parker. The original designation of Mrs. Parker as the beneficiary was in the nature of an inchoate or unexecuted gift, and left the member free, under the provision of the law above quoted, to change the payee at his pleasure, with the consent of the company. That Mrs. Parker paid some of the assessments is not material, as it is not shown that she did so with her separate estate, or under any contract by which she was to acquire a vested right. The case of Smith v. Society, 123 N. Y. 85, 25 N. E. 197, has no application to the facts of this case.

But it is said that the woolen-mills company took issue upon the question of undue influence and coercion, and should not be allowed to shift ground, and now say that that issue was immaterial. In general terms, the answer denied that Mrs. Parker was entitled "to any of the relief sought in her cross bill," and also insisted that it could not be affected by any of the facts upon which the cross bill relied. But, aside from this, we think that taking issue upon an immaterial question of fact does not operate as an estoppel, and that it is not too late to insist that Mrs. Parker's joining in the assignment was not necessary to the title of the assignee under the member's assignment.

The matters we have considered are conclusive of the case, and render unnecessary a consideration of other questions. The decree of the circuit court must be affirmed, each appellant paying one-half the costs.