### GOUGH et al. v. HAMBURG AMERIKANISCHE PACKETFAHRT AKTIEN-GESELLSCHAFT.

(District Court, S. D. New York. November 13, 1907.)

1. ADMIRALTY—JURISDICTION—RESTRICTIONS IN BILL OF LADING.

A court of admiralty of the United States has jurisdiction of a suit against the charterer of a foreign vessel to recover for damage to cargo where it obtains jurisdiction over the defendant, notwithstanding a provision of the bill of lading that any disputes arising thereunder shall be determined by the law of a foreign country and in a court thereof.

**2. SHIPPING—DAMAGE TO CARGO—PERIL OF THE SEA.**

    Damage to cargo caused by sea water which entered through a hatch during a voyage across the Atlantic by a new steamer *held* not due to the unseaworthiness of the vessel or any defect in the hatch covers, but to perils of the sea, for which the vessel and owners were not liable under the bill of lading; it being shown that the tarpaulin hatch covers were new and sufficient and properly secured, but that the one above libellant's goods was injured by a cut through the breaking loose of a derrick at night during a very severe storm.

    [Ed. Note.—Loss by perils of the sea, see notes to The Dunbritton, 19 C. C. A. 465; Southerland-Innes Co., Limited, v. Thynas, 64 C. C. A. 118.]

In Admiralty. Suit to recover for damage to cargo.

Black & Kneeland, for libellants.

Convers & Kirlin and Charles R. Hickox, for respondent.

ADAMS, District Judge. This action was brought by Richard Gough and another, composing the firm of Richard Gough and Company, against the Hamburg Amerikanische Packetfahrt Aktiengesellschaft, the charterer of the steamship Neebing, to recover the damage received through the wetting of 239 bags of rice, while being transported by that steamer from Hamburg to Montreal, Canada, in September, 1903. It is alleged by the libellant that the damage "was due to the improper, defective and insufficient condition of the hatch covers of said vessel, which permitted water to leak through said hatches upon the libellants' cargo." The respondent denied that the damages were caused by defective or insufficient hatch covers and alleged that they were due to a peril of the seas or to sweat, both being excepted causes in the bill of lading.

It is suggested by the respondent that the court should not entertain jurisdiction of the action but remit the parties to the Hamburg Courts, respecting which they have provided in the bill of lading: "All disputes regarding this bill of lading are to be settled according to the law of the Empire of Germany and decided before the Hamburg law court." Apart from the terms of the bill of lading, no reason has been advanced for a refusal by the court to proceed with the matter and that it will entertain jurisdiction in such a case has been settled by abundant authority. Prince Steam-Shipping Company v. Lehman et al. (D. C.) 39 Fed. 704, 5 L. R. A. 464; Slocum v. Western Assur. Co. (D. C.) 42 Fed. 235; Mutual Reserve Fund Life Ass'n v. Cleveland Woolen Mills, 82 Fed. 508, 27 C. C. A. 212; Fairgrieve et al. v. Marine Ins. Co. of London, 94 Fed. 686, 37 C. C. A. 190. In view of the authorities and the admission in the answer of the court's jurisdiction, I conclude that the action should be decided upon its merits.

It appears that the Neebing was a new ship built in England by contractors of experience and reputation under the classification of the British Corporation and when finished received from the latter the mark of the highest class. She was designed for use on the Great Lakes and was 256 feet long, about the limit of length to pass through the canal. She was of the usual lake type, with the engine aft, with six hatches and no bulwarks, so that in bad weather the seas necessarily washed over her hatches. There was no criticism upon the vessel

save with respect to the sufficiency of the tarpaulins that covered the hatches. The material thereof was hemp or jute, which are so much alike that it is difficult to distinguish them. There were two tarpaulins for each hatch, well tarred, which made them water tight for all ordinary purposes considering the type of the vessel and the fact that they were constantly exposed in bad weather to being washed by the sea. They were of proper material and well looked after with respect to fastenings upon starting and during the voyage. After the arrival in Montreal, the hatches were taken off and the tarpaulins examined. One set of them, that of No. 3 hatch, where the libellants' rice was stowed, was found to be damaged by a cut received on the night of the 15th, through a derrick, fastened to the main mast, getting adrift. This cut was not of great dimensions but sufficient to somewhat impair the efficiency of the tarpaulins, but, apart from the cut, they were found by subjecting them to a severe water test to be sound and water tight. This test was made by putting water in the tarpaulins and keeping it there for several hours. The tarpaulins were subsequently used on a voyage of the vessel through the Lakes when she met with several heavy storms, including rain, and they proved to be in all respects sufficient.

The vessel met with extraordinarily heavy weather on the voyage during which the libellants' rice was damaged. It can best be described by extracts from the testimony of the chief officer, himself a master mariner, and experienced in taking new vessels from England and Scotland across the Atlantic. He said:

"By Mr. Kirlin: Q. Are you a master mariner? A. Yes, sir.

Q. Where is your home? A. London.

Q. Have you come over here on purpose to give your testimony in this case? A. I have.

Q. How long have you been a master mariner? A. Since 1888, with one or two breaks for illness, etc.

Q. What length of time have you seen service on steam vessels? A. Twenty-eight years.

Q. Have you had considerable experience in taking over vessels from builders, and have you taken them and delivered them at the end of their trial trips and first voyages? A. Yes, sir.

Q. How many ships have you taken over from builders for owners' account in that manner? A. Eight or nine altogether.

Q. How many first voyages have you made? A. About twelve altogether.

Q. Have you done some of those as master and others as chief officer? A. Yes, sir.

Q. Have you had experience in taking over the equipment of vessels, such as ropes and tarpaulins? A. Yes, sir, I have had great experience in that.

Q. In this case, was it your particular duty for the owner of the vessel to examine and pass upon the sufficiency of the equipment that was furnished to the ship? A. Yes, sir.

Q. Did that include the tarpaulins? A. That included the tarpaulins.

Q. Did you make a special examination of the tarpaulins before you accepted them for the ship? A. I did, sir.

Q. What office did you discharge on the Neebing? A. Chief officer. * * *

Q. Tell us what you did and what examination you made in connection with taking over the outfit, particularly the tarpaulins? A. One of the outside foremen asked me if I was ready to take the tarpaulins over, and I said 'yes.' He had them all stowed away in the fore end of the ship, and with that he got some men and spread the tarpaulins all over the hatches, and when they were all stretched over the hatches, I examined them all.

Q. How many were there for each hatch? A. Two for each hatch.

Q. Were they new? A. Perfectly new, yes.

Q. What was your object in having them spread out over the hatches? A. So that I could see that they fitted properly and also the quality, the thickness.

Q. How did you have them spread over? A. Two tarpaulins on each hatch. The reason I had them all spread over was more to see that they all fitted properly.

Q. Did they fit properly? A. Yes, sir.

Q. What examination did you make as to their quality and sufficiency in regard to weight and water proofness? A. I took hold of the corners of each tarpaulin, lifted them up and tested them that way, I could tell by the closeness of the weaving that they were sufficiently water-tight.

Q. Did you examine the weaving? A. I examined the tarpaulins thoroughly.

Q. Were they tarred? A. Yes, sir, well tarred.

Q. What is the practice as to tarring tarpaulins on vessels of this class? A. In most cases they dip them in and hang them up and let them dry—in the tar.

Q. What do you say as to the reasonable adequacy of the tarring of these tarpaulins for their purpose? A. They were quite good enough for their purpose.

Q. What do you say as to the sufficiency of the number of tarpaulins that were provided for each hatch? A. Two new tarpaulins is quite sufficient, and it is recognized on the other side to be sufficient for any ordinary bad weather.

Q. In your experience, what has been the usual number provided for new ships? A. Two new tarpaulins for each hatch; and no more.

Q. What do you say as to whether these are or not of the usual quality provided for ships of this class? A. They are of the usual quality.

Q. And weight? A. And weight; I have had experience from being on board—when I have been in ships belonging—that is, I have been on board of ships when their outfits have been taken on, and the quality of the tarpaulins was the same.

Q. Were they canvas? A. They were canvas, yes. What they call tarpaulin canvas.

Q. What number were they? A. I didn't see the mark, but judging from the weight of it, I consider it the No. 3 canvas, which is the usual thickness of canvas that they use for tarpaulins.

Q. You then accompanied the ship from where she was delivered over by the builders to her owners, to Hamburg, and came on the voyage to Montreal? A. I did.

Q. Did you go on with her from there? A. I went on up the Lakes with her, yes sir.

Q. Through the Canal? A. Through the Canal, yes.

Q. How long did you remain with her? A. I think it was—I went up as far as Port Arthur and looked after the discharging of that cargo and the loading of another cargo, and back to Buffalo, and left the ship in Buffalo.

Q. During the entire time that you were with her were these tarpaulins in use? A. They were.

Q. Were any other tarpaulins used? A. I don't remember any other.

Q. Who overlooked the loading and stowage of the cargo in Hamburg? A. I did.

Q. What do you say to the manner in which that work was done? A. It was done in a proper manner.

Q. Who did the loading? A. The stevedore, under my supervision.

Q. What stevedore? A. The Hamburg stevedores.

Q. Stevedores of the Hamburg-American Packet Company in Hamburg? A. Yes sir. * * *

Q. What was done with regard to battening down the hatches after the completion of the loading in Hamburg? A. They were all stretched out and battened down in the usual way, with iron battens and hardwood wedges.

Q. Did you see that done yourself? A. I supervised every hatch myself personally.

Q. How many tarpaulins were put on each hatch? A. Two, sir.

Q. What do you say as to the manner in which they were battened down?
A. They were battened down in the ordinary way; the tarpaulins were spread out * * * the hatches were thwartship hatches and the tarpaulins were stretched out and doubled up underneath, and the iron battens put in, and the wedges put in after. * * *

Q. What do you say as to whether they made the hatches water-tight or not? A. It was quite sufficient to make the hatches water-tight.

Q. What kind of weather did you experience on the voyage over from Hamburg to Montreal? A. Exceptionally heavy weather.

Q. About when did the rough weather begin, the exceptional weather? A. On the ninth; about three or four days after we left Hamburg. * * *

Q. Describe the weather to His Honor, during the remainder of that voyage, as nearly as you can? A. On the ninth and eleventh there was very heavy gales, northwest, with beam seas; on the twelfth the weather was much finer; after that there was heavy weather the whole time, right up to the 20th, when we got to Bell Isle, blowing continuous heavy gales the whole time from the northwest.

Q. Were these the ordinary storms that you expect to encounter at that time of year? A. No sir; they were exceptionally heavy.

Q. Have you had a great deal of experience in the Atlantic? A. Yes sir; I have been across over a hundred and fifty times.

Q. What do you say as to the general character of the weather on that voyage, and of the sea? A. It was exceptionally heavy.

Q. What effect did it produce on your vessel? A. It made her roll violently, owing to the direction of the wind. Had the wind been easterly, the vessel would not have rolled so heavily, but, being from the northwest, there was a beam sea the whole way. The decks were flooded with water the whole time during the bad weather.

Q. Were they merely wet with spray, or was it solid water? A. It was dangerous to come along the decks. I had to have a life line stretched fore and aft for the men to go back and forth along the deck, to save them from being washed overboard.

Q. Were your tarpaulins affected, or were the battenings of the tarpaulins affected by the water? A. No. 4 and No. 5 on two occasions were washed off.

Q. What was the evidence that indicated that fact to you? A. The continuance of the wash of the water washed the wedges out.

Q. What effect did that have on the tarpaulins? A. The wind went underneath the tarpaulins and blew them up and the water washed underneath.

Q. When did the wedges wash out of No. 4 and 5 hatches? A. I can't say; on one occasion it was during the night, about midnight; and on another occasion when it had been blowing two days, we discovered it at daylight, in the morning.

Q. Did you give attention to the wedges of the battens during the voyage? A. I did; I went down and drove the wedges in, which is customary—when you have a carpenter, he does it, but when there is no carpenter, the chief officer does it, and there was no carpenter on those ships.

Q. Did you do it during the bad weather? A. Yes sir; continually, every evening before dark and every morning at daylight.

Q. And you found the wedges started on two occasions? A. On two occasions."

There is no apparent reason to doubt the truth of these statements and I think they convincingly show that the tarpaulins were of good quality and properly battened down with iron battens and hardwood wedges so that the hatches were water tight and that through the breaking of the clutch of the boom or derrick in a very severe storm, the tarpaulins covering No. 3 hatch were rendered useless for the time for keeping out water. Probably there was some damage in the compartments reached through the other hatches but whether that occurred by reason of the tarpaulins is not very important here. The

question is whether the tarpaulins of No. 3 were sufficient and that they were so is seemingly beyond the region of reasonable doubt.

The libel is dismissed.