[Civil No. 2072.   Filed May 24, 1924.]

[225 Pac. 1112.]

## JOSE T. OTERO, TRINIDAD E. DE OTERO, GUADALUPE DE OTERO, TRINIDAD O. DE TERRAZAS, RODRIGO A. OTERO, Doing Business Under the Name and Style of JOSE T. OTERO E. HIJOS, Appellants, v. BANCO DE SONORA, a Corporation, Appellee.

1. CONTRACTS—PROVISION REQUIRING SUBMISSION OF ALL CONTROVERSIES TO MEXICAN COURTS HELD NOT TO OUST COURT OF JURISDICTION.—Where parties and subject matter were within the jurisdiction of Arizona court, a provision of contract purporting to limit all controversies under it to courts of Hermosillo, Mexico, *held* not to oust superior court of jurisdiction.

2. PRINCIPAL AND AGENT—PROVISION OF CONTRACT AS TO RATE OF EXCHANGE CONSTRUED.—Under a contract executed in Mexico, requiring sales agent to give a premium of 200 per cent on amount received as proceeds of sale in American gold and best possible premium for pesetas where sales were made in European specie, it was bound to pay in kind or at current rate of exchange, and, where it could not segregate the sales for American gold, the whole account should be settled on such basis.

3. PRINCIPAL AND AGENT—PRINCIPAL NOT REQUIRED TO SUFFER WHERE AGENT MINGLES PRINCIPAL'S FUNDS WITH HIS OWN, SO THAT HE IS UNABLE TO SEPARATE THEM.—Where agent mingles principal's funds with his own, so that he is unable to separate the one from the other, principal is not required to suffer, but he is entitled to entire fund.

APPEAL from a judgment of the Superior Court of the County of Santa Cruz. Samuel L. Pattee, Judge. Judgment ordered vacated and cause remanded with instructions.

1. Validity of provision in contract as to place where action may be brought, see note in L. R. A. 1916D, 696. See, also, 27 R. C. L. 785.

2. See 18 R. C. L. 1279.

3. See 26 R. C. L. 1354.

See 2 C. J. 735 (1925 Anno.), 742; 13 C. J. 455.

Messrs. Kingan, Campbell & Conner, for Appellants.

Messrs. Duffy & Robins, Mr. Ernest Purdum, and Messrs. Armstrong, Lewis & Kramer, for Appellee.

LYMAN, J.—This action by Otero and others is to recover a balance claimed to be due and unpaid on account of goods sold for them by Banco de Sonora, a corporation, as their agent.

The bank objected to the jurisdiction of the court, upon the ground that the contract out of which the action grew undertook to and did limit the jurisdiction of all controversies arising under it to the courts of Hermosillo, Mexico. This plea was denied, and the case tried upon its merits by the court without jury, and judgment rendered for the defendant bank dismissing the case. The bank appealed from the order denying its plea to the jurisdiction. The Oteros appealed from the judgment upon the merits.

The contract is in writing, dated June 2, 1912, and made at Hermosillo, Mexico. It assumes to be a "mercantile commission contract" in which the Oteros are parties of the first part, and the bank party of the second part. By its terms "the parties of the first part commission the Sonora Bank that this institution take charge in its name, and to the best possible advantage sell in the markets of this country and foreign countries, the present crop of garbanzo which the said parties of the first part have." "The Banco de Sonora binds itself to advance to the principals, or producers, five dollars for each sack of one hundred kilos of garbanzo," and also to advance necessary expenses of shipping, insurance, and other costs enumerated, incident to placing the garbanzo on the proper market, for which the Banco de Sonora shall receive "an interest at nine per cent," the garbanzo to be at all times subject to the risk of the "principals, parties of the first part,"

the Banco de Sonora not being responsible for loss or damage through transportation by various carriers either by land or sea, or from any other cause, the principals to stand all consequences, "renouncing the rights granted them by articles 294 and 295 of the Commercial Code." A minimum selling price is fixed, and a commission of 4 per cent on the net product of all sales of garbanzo that are made according to this agreement is assigned to the Banco de Sonora. Returns of all partial sales are to be made and after deducting expenses and "money advanced" the balance is to be paid "once the sale is made" to the principals. The bank binds itself to give a premium of 200 per cent for American gold, and the best possible premium for pesetas, disputes growing out of the agreement to be submitted to the judges of Hermosillo.

The full text of the contract relating to jurisdiction of disputes presented under it is as follows:

"Both parties to this contract agree that in case any difficulty should occur by reason of the interpretation or execution of this contract, they will subject themselves to the jurisdiction of the judges of this city, to the effect that the difficulty shall be decided by any of them, and to this end the persons who constitute the first part renounce the forum of their domicile and the mandate of article 1105 of the Commercial Code."

The article of the Commercial Code referred to provides:

"If a designation has not been made as is authorized by the foregoing article, the judge to be competent shall be the judge of the domicile of the debtor."

The foregoing article, 1104, is as follows:

"No matter the nature of any suit the judge to be preferred to any other shall be first; the court of the place the debtor has designated and where he may be required judicially to pay; second, the place desig-

nated in the contract for the fulfillment of the obligation.''

These paragraphs of the Commercial Code of Mexico, and the clause of the contract relating thereto, were the subject of expert testimony by several learned and experienced members of the Mexican bar. They did not all arrive at the same conclusion as to the effect of this paragraph of the agreement in the light of Mexican law, some being of the opinion that no other court was open to the controversy except that designated in the agreement, and others construed it to merely authorize suit against the Oteros in the courts of Hermosillo, the bank being located in that city, and the appellants being numerous and domiciled at other places, while the Oteros, if plaintiffs, were not limited to that venue.

At the time of the execution of the contract, the Oteros were all citizens and residents of Mexico. The bank was a Mexican corporation, having its place of business at Hermosillo, Sonora, Mexico, with other offices and places of business in other cities of Sonora and Chihuahua, Mexico. During the year 1913, Sonora, Mexico, was in a state of civil war. The Oteros, or some of them, were actively engaged in the conflict. The Banco de Sonora found it advisable to close its place of business at Hermosillo, as well as at some other points in Mexico, taking practically all of its funds from Hermosillo, its books and records, and move across the line and locate at Nogales, Arizona, where it continued to do business. Those interested in the corporation formed a new company under the laws of this state. The Banco de Sonora did part of its business through that agency, but continued to directly and in its own name carry on its former business in Mexico to some extent by means of correspondence. It had there many items of business and much real estate, which continued to be the subject of its care.

For some years following, the courts of the state of Sonora were partially dormant. Such government as existed in the state was not recognized by the central government of Mexico, and no appeal from its courts would lie to the Supreme Court of the nation. In September, 1917, the normal functions of the courts of that state were restored, at least theoretically. They were, however, practically closed to many persons whose political activities had excluded them from the state. Some of the Oteros, and one or more of the officers of the Banco de Sonora, were in that situation, so that at the time this action was commenced a litigation of the questions involved in it before the courts of Hermosillo was impracticable. The bank with its records, funds and officers was located at Nogales, Arizona. A part of the plaintiffs resided there, and there negotiations for settlement were carried on between the parties interested. Both the subject matter and the parties litigant were within the jurisdiction of the superior court of Santa Cruz county. No impediment to the jurisdiction of that court existed unless it could be found in the agreement referred to.

It is essential to orderly society that disputes should be settled speedily and without unnecessary inconvenience to the disputants. The laws of the state are so framed as to accomplish that purpose. Courts are established and invested with jurisdiction to meet that·end. Such regulations cannot be bartered away, and are not usually the subject of contract.

"The rules to determine in what courts and counties actions may be brought are fixed, upon considerations of general convenience and expediency, by general law; to allow them to be changed by the agreement of parties would disturb the sympathy of the law, and interfere with such convenience." *Nute* v. *Hamilton Mut. Ins. Co.*, 6 Gray (Mass.), 174; *International*

*Travelers' Assn.* v. *Branum,* 109 Tex. 543, 212 S. W. 630.

In *Nashua River Paper Co.* v. *Hammermill Paper Co.,* 223 Mass. 8, L. R. A. 1916D, 691, 111 N. E. 678, it was decided that a stipulation in a commercial contract between a corporation domiciled in Massachusetts and a Pennsylvania corporation, that no action should be maintained against the latter in any court other than the court of common pleas of Pennsylvania, was unenforceable, and was not a bar to the maintenance of such an action in the courts of Massachusetts,

A similar rule is enforced by the federal courts. *Home Ins. Co.* v. *Morse,* 20 Wall. (U. S.) 445, 22 L. Ed. 365; *Doyle* v. *Continental Ins. Co.,* 94 U. S. 535, 24 L. Ed. 148 (see, also, Rose's U. S. Notes); *Mutual Reserve Fund Life Assn.* v. *Cleveland Woolen Mills,* 82 Fed. 510, 27 C. C. A. 212.

Those who seek the protection of our flag to carry on their business should not object to the jurisdiction of our courts to settle the differences arising in the course of such business. This dispute arose on our soil. The plaintiff asserts that he has been injured in our land. The courts of this state will not close their doors against him, nor send him to a foreign jurisdiction to seek redress.

The general intent of this agreement is that the agent should sell the garbanzo, and pay over to its principal the entire proceeds of the sale, less expenses and the stipulated commission of 4 per cent. The contract explicitly and definitely provides for prompt returns of all "partial" sales, and remittance to the principal "once the sale is made." The function of the agent is to act in place and stead of the principal, not for himself but for the principal. Under the contract the garbanzos were all marketed during the period of time extending from July, 1912, to October, 1913, at various places in the United States and

Europe, and payment made to the Banco de Sonora in gold specie of the several countries where the merchandise was sold. All this gold was deposited in New York City, to the credit of the Banco de Sonora, and used by it in carrying on its general business; the sales account being credited with the amount of money received in terms of American dollars.

No statement was rendered to the Oteros of the sales as they were made, and with the exception of an insignificant item which was credited to the account of the Oteros in the Banco de Sonora on account of a small quantity of spoiled beans, which apparently was disposed of locally, no money was deposited to the credit of the Oteros on account of the garbanzo sold until August 15, 1914, when there was placed to the credit of Oteros on account of such sales the sum of 146,134.05 pesos, the proceeds, the bank says, of the entire amount of sales made at the rate of two pesos for one American dollar, into which all of the proceeds of sales had been converted, although the Oteros at all times had an account subject to check in the Banco de Sonora, which was replenished from time to time during this period by loans made by the Banco de Sonora.

There is no disputed issue of fact, but the parties differ as to the construction of that portion of the contract which directly relates to and is assumed by the Banco de Sonora to wholly govern the medium of payment and the rate of exchange. Concerning these matters the contract provides:

"The said bank binds itself to give the premium of two hundred (200%) per cent on the amount that it should receive in American gold, for the sale realized and the best possible premium for pesetas in case that the sales should be made in that specie."

It is the view of the Oteros that the moneys received from the sale of their merchandise by their agent belong to them, and should be accounted for

upon demand in the medium of exchange received, that is gold, or, if measured in pesos, then at the current rate of exchange at the time when payment is made or tendered, the effect of this paragraph being merely to bind the bank to pay not less than two for one of American money, and "the best possible premium for pesetas," in case sales are made in that specie, but not requiring them to accept two pesos for each dollar from whatever source received, whatever the current rate of exchange might be.

The bank, on the contrary, conceives itself to have fully discharged its obligation by effecting the payment of all the proceeds in pesos at the rate of two for one of American money, regardless of the specie in which it made the sales.

It is not claimed that the bank ever attempted or offered to make payment in the gold received in the currency of European countries at "the best possible premium." Whatever obscurity may be conceived to exist concerning the payments for merchandise sold directly for American gold, none whatever exists as to the medium and method of payment for merchandise sold in Europe, some of which was paid for in gold pesetas, and some in English pounds sterling. As to how English pounds sterling were to be remitted, no mention is made. The relationship of principal and agent, therefore, requires that they should be either paid in kind, or in such other currency as the principal may require at the current rate of exchange.

No separate account was kept of the sales made in European specie, and those made in American money. It all was deposited together, to the credit of the Banco de Sonora in terms of American dollars.

This mingling of all the proceeds in one account was done by the bank, and cannot affect the right of the Oteros to demand and receive an accounting in the way pointed out by the sales agreement. If the bank

is unable to segregate the two classes of money the one from the other, then the Oteros are entitled to demand an accounting of the whole fund in the specie in which it was received. If it cannot account for the amount received in European gold, which is admittedly a substantial, if not the greater, portion of it, then the Oteros are entitled to a settlement of the whole account on the basis of European gold. This is not only in accordance with the agreement, but it imposes no hardship upon the bank. It requires the bank to account for and pay to the Oteros the money which it received, less such deduction as the contract provides for. Where the agent mingles the funds of his principal with his own, so that he is unable to separate the one from the other, or distinguish one from the other, the fault of the mingling being his own, the principal is not required to suffer as a cause of it, but becomes entitled to the entire amount.

"If an agent, whose duty it is to keep the goods and effects of his employer separate, mix them with his own, it lies upon him to distinguish them; and if he cannot, . . . the whole is to be considered as belonging to the other. . . . Every sort of profit . . . derived by an agent from dealing or speculating with his principal's effects, is the property of the latter, and must be accounted for." *Yates* v. *Arden,* Fed. Cas. No. 18,126.

The application of that principle to this fund does not require the agent to surrender any portion of his own fund. It merely requires him to forego any possible profit he might reap on account of the somewhat doubtful construction which he has given to the contract.

From the manner in which the bank kept its accounts, it is evident that it attached no importance to the distinction which it now seeks to make between American dollars and European money. When it mingled the two together, the bank evidently ex-

pected to pay its principal either in gold, or its equivalent in pesos at the current rate of exchange. It will not be presumed that it deliberately contrived to violate the contract or defraud its principal.

Upon the execution of this agreement, and in conformity with its provisions, the bank began advancing funds, which were placed on the account of the Oteros in the Banco de Sonora. These funds were withdrawn from time to time upon Oteros' check Upon these advances the bank charged interest at the rate of 9 per cent, which was reckoned upon all such advances until August 15, 1914, when the garbanzo proceeds were deposited to Oteros' account and canceled the loan. Counsel for the bank in their argument have treated these advances on which interest was charged as partial payments made on account of the sales. That position is manifestly untenable. These funds were loans pure and simple, made like any other loans, and charged for as such, and payment secured by the possession primarily of the garbanzos, and later by the proceeds from sales.

When this contract was made, the American dollar was worth substantially two pesos. No substantial change in these relative values took place until at least half the garbanzos had been sold and paid for, and nearly a year had in the meantime elapsed with no returns made, and no credit given on account of such sales. Another year elapsed before any account was rendered. In the meantime the peso had swiftly declined in value. In April when the bank rendered its account, the peso was worth about 30 cents in American money. When credit was finally given on the books of the bank on October 15, 1914, and the loan to Oteros thereby canceled, the peso was worth about twenty-five cents in American money.

The cashier for the bank upon the witness-stand was very reluctant to commit himself to any definite statement as to the rate of exchange between the

two moneys on that date; but on August 8, 1914, about a week before it made the deposit to the account of the Oteros, it had charged the Oteros at the rate of four pesos for one dollar on account of a telegram sent them, which was a fair and no doubt accurate demonstration of the value of the peso at that time.

The bank sold the merchandise for $73,067.02 in gold. They deposited to the credit of the Oteros pesos which were worth in gold at that time $36,-533.02. The Oteros were entitled to this gold, all deductions having been already made, or pesos at the "best possible premium." What the Oteros actually got was half of the gold at the current rate of exchange in pesos. They are entitled to the balance of it in American money, into which all this gold had been converted. The court should therefore have rendered judgment in favor of the Oteros for $36,533.02.

The judgment will accordingly be vacated, and the cause remanded, with instructions to enter judgment in favor of the Oteros in the sum of $36,533.02, with interest at 6 per cent from the date of the original judgment.

McALISTER, C. J., and ROSS, J., concur.