## Case No. 6,765.

### The HOWDEN.

[5 Sawy. 389.] [1]

District Court, D. California. .Feb. 4, 1879.

CARRIER—DEFECTIVE MEANS.

Where a vessel delivered her cargo in a damaged condition, and the proof showed that the damage was due to the defective and obsolete construction and arrangement of her bulwarks and stanchions, which required extra precautions in the way of dunnage to prevent injury to her cargo, and such precautions were neglected: *Held*, that the vessel was liable, notwithstanding that the log-book showed that she had encountered some heavy weather on the voyage.

[This was a libel in rem against the ship Howden to recover damages for the delivery of her cargo in damaged condition.]

Milton Andros, for libelant.
C. Temple Emmet, for claimant.

HOFFMAN, District Judge. ·It is not denied that the goods in question in this case were shipped at Calcutta on board the "Howden," and that when delivered at this port they were in a very damaged condition. The defense relied on is, that the damage was caused by the perils of the seas. On the arrival of the vessel two separate surveys were held upon her and her cargo. The first was made at the request of the libellants, by Captains Davidson and Freeman. The second was made at the instance of the agents of the ship, Messrs. Dickson, De Wolf & Co., merchants of this city. All these surveyors are experts of great experience and of unquestioned capacity and integrity. From their reports, confirmed by their oral testimony on the stand, it appears that the vessel was of iron, but with wooden bulwarks attached to wooden stanchions. These stanchions passed through the iron stringer plate, and projecting some three feet ·below it, their ends were attached by bolts to the sides of the vessel. It was found that every one of the apertures in the stringer plate, through which the stanchion passed, had leaked during the voyage, and that the damage to the goods in question was due to that cause exclusively.

With respect to the mode in which the cargo was dunnaged, the report of Captains Davidson and Freeman states: "As regards the opinion expressed that the cargo has been dunnaged in the usual manner, we believe this mode would have been sufficient for ordinary iron ships, but as this is an exceptional one, having wooden stanchions passing through the stringer plate, as previously described, we consider that some precautions should have been taken to endeavor to protect the cargo from damage from this objectionable mode of construction." On the stand these witnesses reiterate the opinion

¹ [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

contained in the report, and they add that, in their judgment, a vessel constructed as was the "Howden," would not be seaworthy to carry a dry and perishable cargo without extra dunnage.

Captain Hutchings reports: "That apart from the damage caused by sweat, there was a large amount of salt water damage, caused principally by the objectionable and now obsolete construction of putting rough tree stanchions of wood through iron deck stringers. it being quite impossible to prevent them from leaking. These stanchions were found to be well matted but without dunnage; it is believed they should have been dunnaged. It was also seen that for about fifty-five feet on each side, in the middle section of the ship, the dunnage battens next above the ·between-deck seams were not in place, and that nine upper battens on the starboard, and ten on the port sides, in the section of the ship where cargo had been stowed, were also out of place; and although the frames of the ship were well matted, it is believed that dunnage should have been placed there." It will be observed that this report of an expert, employed by the ship's agents, is even more unfavorable than that of the surveyors employed by the libellants.

It further appeared in evidence that the mode of constructing the bulwarks, which Captain Hutchings characterizes as "objectionable and obsolete," though originally adopted many years ago when ships were first built of iron, has long since fallen into disuse, and in fact been wholly abandoned. The few so constructed that remain are very old vessels which have not been altered, and which have happened to survive the dangers of their service. But perhaps the most significant fact in this connection is the rule adopted by Lloyds' Register of Shipping (London). This rule provides that "the objectionable practice of cutting through the stringer plates for the admission of wooden rough tree stanchions will not be allowed."

One other circumstance of almost equal significance is shown by the testimony. When the vessel was about to receive at this port a cargo of wheat for Liverpool, bulkheads were erected on either wing, made of stout boards and "shingled," so as to shed the water on the outside. and at a distance of from fourteen to twenty inches from the sides of the vessel. Whether the master, taught by his experience on his recent voyage, voluntarily adopted this precaution, or whether it was insisted on by the shippers or insurance companies, does not appear. But the fact that it was resorted to seems to imply the acknowledgment that the defective construction of the vessel rendered necessary the employment of extraordinary methods to protect the cargo, and that the ordinary dunnage which had been used at Calcutta was insufficient.

On the part of the claimants, it is contended that the vessel was, before the com-

mencement of the voyage, surveyed at Calcutta by a Lloyds' surveyor, who directed certain repairs to be put upon her, and on their completion, gave her a certificate pronouncing her "a first-class insurance risk to any part of the globe." But it appears from the testimony of this witness, and from his report, that his attention was in no way directed to the mode in which the bulwarks of the vessel were constructed. The report states that "at the request, etc., he attended the ship 'Howden,' lying, etc., for the purpose of inspecting certain defects in the plating and frames of the vessel, as well as to recommend the best method of repairing the same, and, after a careful inspection of the parts, I now recommend as follows." He then details at length the defects he found in the vessel's frame and plates, and indicates minutely the repairs to be made. On a subsequent day he inspected the repairs reported finished, and found the "repairs advised by him had been fully and faithfully executed." He therefore gives the vessel a first-class certificate.

It thus appears that neither his inspection nor his report had any reference to the original defective construction of the bulwarks. They related solely to injuries sustained by, or defects in, the frame and plates. It is worthy of remark that neither this witness, nor any other sworn in the cause, attempts to defend the mode of construction alleged to be objectionable and obsolete; nor do any of them deny that it has been practically condemned and abandoned, although old vessels constructed in that manner have not entirely disappeared from the ocean. The claimants have also sought to show, by the testimony of the stevedore by whom she was loaded at Calcutta, that the vessel was well and thoroughly dunnaged according to the usage of that port. This statement conflicts with the evidence of the surveyors who inspected her hull, and who testify, as we have seen, to the absence of battens, which should not have been omitted. But even if it be admitted that she was well and thoroughly dunnaged in the usual manner, it will not aid the case of the claimants. The contention of the libellants is that the exceptional and defective construction rendered necessary dunnage of an extraordinary and unusual character, such as was employed when she was loaded at this port, and that that precaution was neglected.

It is also contended by the claimants that the vessel encountered such severe and boisterous weather during the passage as to justify us in ascribing the damage to the cargo to "perils of the seas." We have already seen what, in the opinion of the experts, was the real cause of the damage, and that it would have occurred to some extent at least under the conditions presented by any ordinary voyage, "it being quite impossible," Captain Hutchings states, "to prevent them (the stanchions) from leaking,"

But the record of the voyage, as contained in the log-book, wholly fails to show that the weather was of exceptional severity. On several occasions the ship is noted as laboring heavily; twice she is obliged to lie to. But nothing is said of any damage to her on these occasions. She is not spoken of as straining, opening her butts or seams, or making an extraordinary quantity of water. She appears to have encountered only the ordinary vicissitudes of weather to be expected on a voyage from Calcutta to this port by the southern passage. On her arrival no signs of having been strained or in any way damaged could be detected. The experts unanimously attribute the injury to her defective construction and insufficient dunnage, and reject the suggestion of damage by sea peril. If, under the evidence in this cause, after a voyage such as the log-book shows that of the "Howden" to have been, the defense of perils of the sea be admitted, it is probable that few, if any, vessels arrive at this port after long voyages, the log-books of which would not furnish a similar means of evading their obligations as carriers.

An interlocutory decree for the libellant, and order reference to the commissioner to ascertain the damages.