## JOHNSON v. COLUMBIA PHONOGRAPH CO.

## SAME v. NATIONAL GRAPHOPHONE CO.

### (Circuit Court, E. D. Pennsylvania. January 28, 1901.)

### Nos. 12, 13.

---

## THE FREY.

### (Circuit Court of Appeals, Second Circuit. January 4, 1901.)

### No. 8.

1. SHIPPING—DAMAGE TO CARGO—PERILS OF THE SEA.

Where the excessive violence of the sea is the efficient cause of the shifting of cargo, causing breakage and leakage, by which other portions of the cargo are damaged, without which the damage would not have occurred, it is the proximate cause of such damage; and whether it constitutes a peril of the sea, within the exception in the bills of lading, is a question of fact, to be determined upon the circumstances of each case, depending upon whether a seaworthy vessel, properly trimmed and with the cargo properly stowed, would ordinarily go through such seas without material injury to its cargo.[2]

2. SAME—ACTION FOR DAMAGES—BURDEN OF PROOF.

The burden rests upon the carrier to prove that damage to cargo, occurring after its receipt and before its delivery, was due to a peril of the sea, within the exemption contained in its bills of lading.

3. SAME—EVIDENCE.

Iron drums of glycerine were stowed in between-decks of a steamship, one tier high. A platform was built over them, and heavy bales of rags, extending nearly to the deck beams, were stowed over them. According to the testimony of all who observed the manner of the stowage of the cargo in between-decks, it was well secured and protected. When the ves-

---

[1] Pleading in infringement suits, see note to Caldwell v. Powell, 19 C. C. A. 595.

[2] Shipping, loss by perils of the sea, see note to The Dunbritton, 19 C. C. A. 465.

sel was a few days out it was found that the dunnage between some of the drums had worked loose, and it was replaced. On arrival in New York it was found that some of the drums had shifted from their original positions, and the glycerine had leaked on the cargo. The weight of testimony was decidedly to the effect that not only was the between-decks the proper place to carry the drums, but a proper place in respect to the distribution of the ballast. The evidence showed that, while the gales were not heavy, they came from different quarters, making cross seas of great violence, and the rolling and pitching of the vessel was excessive. Much of the time the crew could not lie down or sit down, and no meals were served. *Held* to show that the steamship was properly trimmed and the cargo was properly stowed, and that the damage to it in crossing the Atlantic was fairly attributable to a peril of the sea.

Appeal from the District Court of the United States for the Southern District of New York.

J. Parker Kirlin, for appellant.
Walter F. Taylor, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. Owing to the rolling and pitching of the steamship Frey on her voyage from Havre and Dunkirk to New York in January, 1898, certain drums of glycerine, part of the cargo laden on board at Dunkirk, which were stowed in tiers in the between-decks, shifted, worked loose from the tiers, and cut and broke one another, causing extensive leakage of the contents. Some of the glycerine drained through the ventilator hole to the hold beneath, the ventilator having been carried away by the moving cargo, and the contact injured certain furs or skins stowed in the hold. The libel was filed to recover the damages sustained by the owners of the glycerine and furs. The bills of lading under which the cargo was shipped excepted the vessel from liability for loss or damage by "perils of the sea," or by "drainage, leakage, breakage"; and the answer set up these exceptions as defense. The court below decreed in favor of the libelants, and the owners of the vessel have appealed.

The rolling and pitching of the vessel was excessive. It was caused by the violent cross seas she encountered, and was the immediate cause of the shifting of the cargo and the breakage of the drums, and the consequent drainage and leakage. The violence of the seas was the causa causans which set in operation every agency that contributed to the loss; and upon the principle, alike applicable to exceptions in bills of lading and in policies of insurance, if that was the efficient cause, without which the damage to the cargo would not have occurred, it was the proximate cause, and the breakage, drainage, and leakage were but the effect. U. S. v. Hall, 6 Cranch, 171–176, 3 L. Ed. 189; Insurance Co. v. Boon, 95 U. S. 117, 24 L. Ed. 395; The G. R. Booth, 171 U. S. 450, 19 Sup. Ct. 9, 43 L. Ed. 234.

It follows that the only exception in the bill of lading which shields the vessel in the present case from her liability as a common carrier is that of the peril of the seas. The case presents the single question whether the loss was caused by a peril of the seas, and that question is purely one of fact. Upon this issue the burden of proof is upon the

vessel; the rule being that, when goods in the custody of a common carrier are damaged after their receipt and before their delivery, there is a prima facie presumption that the carrier was at fault. The Warren Adams, 20 C. C. A. 486, 74 Fed. 413. As the testimony of the witnesses was not taken in the presence of the district judge, this issue must be decided by this court as though it were to be decided originally.

The proofs are persuasive that the Frey encountered cross seas of unusual violence almost continuously upon the voyage after she was two or three days out from Dunkirk, due not so much to the force of the winds as to the rapid changes in their direction. The testimony, coming, as is to be expected, from her officers and men, is to be read with due allowance for that circumstance. They testify, and their testimony does not seem to be exaggerated, that the weather was not exceptionally heavy, but that much of the time there were very heavy cross seas from all points of the compass. To use the words of the master, there was "a good, stiff gale, but that was nothing. The sea was so fearful that I have never seen the like in my time." The vessel rolled and pitched so considerably that much of the time the crew could not lie down or sit down, and no meals were served. The stokers in the fire room had to build passageways from the boiler to the fore and aft bulkheads, so that they could stand between the planks and brace themselves. At times the rail of the vessel was under the water. The situation for 24 hours, when she was eight days out, is characterized in the log entry as follows: "She is pitching heavily down forward, the sea from the two sides; and she rolls, too."

The court below was of the opinion that the excessive rolling of the vessel was ascribable to the method of the distribution of her cargo in lading, and that the glycerine ought not to have been laden in the between-decks, or, if laden there, more weight of cargo or ballast should have been laden above the glycerine to make the vessel easy. In his opinion the district judge used this language:

"As I cannot find in this case that there was any such extraordinary wind or seas as might not have been reasonably anticipated in crossing the Atlantic in the month of January, or such as should naturally have caused such a shifting and destruction of cargo in a well-loaded and well-ballasted ship, I must ascribe the primary cause of this loss to insufficiency in the ship's condition in that respect at the time of sail'ng,—in other words, unseaworthiness at the time of sailing, as respects the loading and ballasting for the carriage of the glycerine in the between-decks as it was there stowed."

The Frey is a schooner-rigged steel steamship of the "switchback" type, having a cargo capacity for winter voyages of about 3,900 tons, 322 feet long, 41½ feet beam, and drawing about 23 feet. Her hold is separated into four compartments, numbered from forward aft; Nos. 1 and 2 being forward of the engine room, and Nos. 3 and 4 aft. The between-decks is over holds Nos. 1 and 2, does not extend aft beyond the engine room, and is about 6½ feet high. It is divided longitudinally by an iron bulkhead, except at the forward hatch. It contains in the after part a trunkway constructed of metal plates

106 F.—21

leading from the main deck to the hold, and has in the forward part an ordinary hatchway leading from the main deck to the hold. Part of her cargo was laden on board at Havre. The glycerine was taken on board at Dunkirk. The master and chief officer directed the glycerine to be stowed in the between-decks, upon consultation, and upon the theory that it was better to stow it there to make the ship easy, in view of the light cargo she was to carry. It was in iron drums, cylindrical in shape, about $3\frac{1}{2}$ feet long and $2\frac{1}{2}$ feet in diameter, 66 in number, and weighing each 1,300 pounds. These drums were stowed one tier high. A platform was built over them, and heavy bales of rags and bundles of skins, extending nearly to the deck beams, were stowed over them. No cargo was stowed within or at the sides of the forward hatchway. The weight of the cargo carried in the between-decks was about 60 tons. Besides this, there was in the after part of the between-decks, but separated from the cargo by a transverse wooden bulkhead, about 200 tons of coal. The rest of the cargo weighed about 600 tons, and was stowed in the hold,— dry cargo in No. 4, a quantity of bulk chalk in No. 3, which came up in the middle of the seams, and a quantity of general cargo, consisting of boxes, casks, and bales, in No. 2. No cargo was laden in No. 1 hold. She carried altogether 420 tons of coal, and had in the usual tanks in the ship's bottom 556 tons of water ballast. According to the testimony of all the witnesses who had an opportunity of observing the manner of the stowage of the cargo in the between-decks, it was well secured and protected.

The ship left Dunkirk January 8th, and the first heavy weather was experienced on the 10th, when some of the cargo in the lower hold worked loose, but was replaced. On the next day it was found that the chocking or dunnage between some of the drums had worked loose, but had not broken from the tiers, and the dunnage was replaced. When the ship reached New York the drums on one side of the between-decks, aft of the hatchway, had entirely shifted from their original positions, but on the other side were intact in their tiers. Those forward of the hatchway were also intact, but some of the bales of skins had been thrown in the open space of the hatchway. The shifting drums had carried away the ventilator and part of the transverse bulkhead. Mr. Tiffany, general manager of the Atlantic Stevedoring Company of New York City, supervised the unloading of the Frey after she arrived. He had had 12 years' experience at sea, and had been the chief officer of steamships and the master of sailing vessels. From his observation of the cargo as it looked when the ship was opened for inspection, he formed the opinion, and so reported to the consignees, that one or two drums had jumped from the after tier, and the others then got adrift.

Undoubtedly the drums were liable to greater motion when the ship was rolling when stowed in the between-decks than they would have been had they been stowed in the hold; but, on the other hand, they were not exposed to greater risk by the pitching of the ship, and it is as probable that they broke from the tiers by the pitching during the eighth and ninth days of the voyage as that they did so earlier or later

because of the rolling of the vessel. The weight of the testimony, as we view it, is decidedly to the effect that the between-decks was not only the proper place in which to carry them, but a proper place in respect to the disposition of the cargo and the distribution of the ballast which the ship was to carry on the intended voyage.

The judgment of the master and officers as to the proper trim of the ship and the proper distribution of the cargo and weights is much more valuable than that of the witnesses who expressed opinions in answer to hypothetical questions. The former were acquainted by experience with the characteristics of the ship, and, as is well known, two ships built on the same lines act differently under similar conditions of wind and sea. The loading of the glycerine had reference to the trim of the ship as well as to her stability in view of her cargo and ballast, and the drums were placed in the between-decks for the purpose of making her easy for the voyage. The expert witnesses for the libelants never saw the ship. The expert witnesses who did see her approved the judgment of her officers. Mr. Tiffany, after testifying that in his judgment the cargo of the Frey was properly distributed, on cross-examination testified as follows:

"Question. The Frey would have been easier had she had more weight between-decks on this voyage, would she not? Answer. I am unable to state, because I was not aboard of her. Question. Having more weight between-decks would have had a tendency to make her easier, would it not? Answer. With some ships it would, and with some ships it would not. Two ships built on the same lines do not act the same way in a gale of wind. Question. I suppose more weight could have been between-decks without altering her trim? Answer. No: she was not enough down at the stern as it was. You cannot go across the Atlantic with a ship's propeller out of water."

Mr. Laverty, port warden, whose duty it was on the arrival of vessels to board and inspect their cargo and make notations of the condition and stowage, upon cross-examination testified as follows:

"Question. The Frey was pretty light, was she not? Answer. Yes; she had a small cargo. All the ships at the time had a small cargo. Question. A great part of the weight of the Frey was in the bottom of the ship, was it not? Answer. Oh, I cannot say that. I would not attempt to say that. That is a matter of experience and judgment. If she was a great roller you would stow it one way, and if she pitched a good deal you might stow it another way. Many features would enter into that. Question. You do not feel qualified to say, then, as to whether the weights were properly distributed in the Frey? Answer. So far as I am aware, I would say yes; they were properly distributed."

The case for the libelants rests almost wholly upon the theory that the weather was not extraordinary, and the consequent inference either that the drums were not properly stowed to resist the rolling of the vessel, or that the weights were not distributed as they should have been to prevent unnecessary rolling of the vessel. We think the seas were sufficiently violent to account for the disaster to a vessel in seaworthy trim, with her cargo sufficiently secured.

There is no rule by which it can be defined with accuracy what degree of violence of the wind or waves is necessary to constitute a peril of the sea. Different cases must be determined according to their special circumstances. The term, of course, refers to only such forces

of the elements as cannot be resisted by the ordinary exertions of human skill and prudence. In Bullard v. Insurance Co., 1 Curt. 148, Fed. Cas. No. 2,122, Mr. Justice Curtis, in his instructions to the jury, used the following language:

"Gales of wind and heavy cross seas are not the ordinary action of the sea. At the same time, if seaworthy vessels usually go through such seas as are described by these witnesses to have existed on this passage, without sustaining material injury, it certainly tends to show that the injuries suffered by the vessel are to be ascribed, not to a peril of the sea, but to the insufficiency of the vessel. It is a matter of fact for your good sense to determine."

The mere rolling of a vessel in a cross sea is not of itself a peril of the sea, as the term is used in bills of lading to restrict the liability of the carrier (The Reeside, 2 Sumn. 567, Fed. Cas. No. 11,657; The Howden, 5 Sawy. 389, Fed. Cas. No. 6,765); but, on the other hand, the term is certainly not restricted to damage inflicted by the extraordinary violence of the winds and waves (Wilson v. The Xantho, 12 App. Cas. 503). It cannot be predicated what degree of rolling and pitching will displace a cargo properly stowed and adjusted. It sometimes happens that vessels receive what seamen term "an unlucky twist" in seas not extraordinarily rough. When it appears that the vessel was seaworthy as respects her intrinsic condition and the fulfillment of all other conditions incident to the prosecution of the voyage, and the cargo has been properly stowed and protected, and it is shown that the injury was sustained during cross seas of unusual violence, the loss may fairly be attributed to a peril of the seas.

Upon a careful consideration of the evidence, we are of the opinion that the damage in the present case was caused by a peril of the sea. The cause is accordingly remitted to the court below, with instructions to dismiss the libel. The costs of this court are awarded to the appellant.