## THE C. W. ELPHICKE.

### (District Court, W. D. New York. June 13, 1902.)

1. SHIPPING—DAMAGE TO CARGO—LIABILITY OF SHIP.

Where cargo was injured after it was received on board a vessel, and before its delivery, the burden of proof rests upon the carrier to show that the vessel was in all respects seaworthy at the commencement of the voyage, before it can invoke the provisions of section 3 of the Harter act, giving exemption from liability for losses arising from dangers of the sea.

2. SAME—SEAWORTHINESS—REQUIREMENT OF HARTER ACT.

A shipowner does not comply with the requirement of section 3 of the Harter act, so as to be entitled to the exemptions therein provided, by merely furnishing proper equipment of the vessel prior to the commencement of the voyage, but he is bound to see that his servants exercise due diligence in its use to make the vessel seaworthy at the time the voyage actually commences.

3. SAME—INSUFFICIENT HATCH COVERINGS.

A steamship carried a cargo of flaxseed from Duluth to Buffalo in November, and on her arrival the seed was found to have been damaged by water, chiefly under the hatches. She encountered a severe storm on the voyage, during which the seas came over her deck, but such storms were to have been expected at the season. Previous to the voyage she had been engaged for a considerable time in carrying ore, and there was

¶ 2. Implied warranty of seaworthiness, see note to The Carib Prince, 15 C. C. A. 388.

evidence which justified a finding that her hatch coamings and covers had been injured in loading and unloading, and had not been repaired, and also that the tarpaulins and strong backs were not in good condition. *Held*, that she was not in seaworthy condition at the commencement of the voyage, taking into consideration the cargo carried and the season, and that such fact was a proximate cause of the cargo damage, which rendered her liable therefor.

In Admiralty. Suit to recover for damage to cargo.

Clinton & Thomas (George Clinton, of counsel), for libelants.

Goulder, Holding & Masten, for respondent.

HAZEL, District Judge. The libel in this cause was filed against the steamship C. W. Elphicke for damages to her cargo of flaxseed during a voyage on the Great Lakes from the port of Duluth, Minn., to the port of Buffalo, N. Y. The damages sustained by the Albert Dickinson Company, owners of the cargo, were paid by libelants, marine insurance companies, which thereupon became subrogated to the rights of the cargo owners. The respondent claims that the damage was occasioned solely through perils of the sea. The proofs on the main issue of the Elphicke's seaworthiness at the commencement of the voyage are conflicting. The proofs for libelants tend to show that the Elphicke left Duluth with a cargo of about 89,500 bushels of flaxseed on November 1, 1896, consigned to the Albert Dickinson Company under 12 separate bills of lading. The flaxseed was in good condition at time of shipment. The Elphicke arrived at Buffalo on or about November 7th, with her cargo damaged by water. The grain was chiefly damaged underneath the hatches,—particularly underneath the after hatch. Libelants argue that the accumulation of water underneath the eight hatches of the Elphicke was due to improper and faulty equipment; that her tarpaulins were old, worn, and unsuited to keep water from leaking through the hatch covers; that their seams and eyelets were ripped and torn; that the staples by which the battens were secured were too far apart, in some instances were missing, and therefore the tarpaulins were not firmly placed upon the hatch covers; that the corners of some of the hatches were chamfered from one-half to three-quarters of an inch; that the hatch coamings were defective, and the strong backs out of place. This condition of the ship allowed the water which swashed her deck during a storm encountered on November 5th to leak through crevices and interstices in the hatches or hatch coamings, which the tarpaulins were designed to cover and protect. Libelants' witness Barrett testifies that underneath hatch covers 1 and 2 the flaxseed was set four inches in depth; Nos. 3, 4, and 5, about two feet; while underneath hatches 6 and 7 a worse condition appeared. The respondent's proofs tend to show that the steamship Elphicke had received in the fall of 1895 the highest insurance classification; that when the Elphicke left Duluth with her cargo of flaxseed she was well fitted and seaworthy; that she possessed and used two sets of tarpaulins, one of which was comparatively new, and entirely suitable for covering hatches and to protect them from leakage. The other was old and worn, but in good condition. Both were used in the usual and cus-

tomary manner,—the old employed as an inner, and the new as an outer, covering. The captain of the Elphicke, as well as others of the crew, testified to the seaworthiness of the vessel at the time of commencing the voyage. None of the defects in hatch coamings and tarpaulins, as testified to by the witness for libelants, when the vessel arrived at Buffalo, were observed by them.

It is strenuously insisted that the stress of weather caused the vessel to strain and twist. This resulted in the damage complained of, and therefore respondent claims the leakage may be properly ascribed to perils of navigation. The issue is, I think, confined to that question alone. On the argument it was stated for respondent that, assuming the tarpaulins were serviceable, the captain of the vessel having under his management and supervision men competent to repair hatch coamings, hatch covers, and seams, and the necessary tools wherewith to make such repairs, the inquiry was pertinent whether the provisions of the third section of the Harter act, under such circumstances, are not properly invoked. If such were the facts, the vessel would not be exempt when the defects existed at the commencement of the voyage. The supreme court has recently passed upon this question in International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830. At page 225, 181 U. S., and page 593, 21 Sup. Ct., 45 L. Ed. 830, the court says:

"We do not think that a shipowner exercises due diligence, within the meaning of the act, by merely furnishing proper structure and equipment, for the diligence required is diligence to make the ship in all respects seaworthy; and that, in our judgment, means due diligence on the part of all the owners' servants in the use of the equipment before the commencement of the voyage, and until it is actually commenced."

Assuming the facts as proved by witnesses for libelants to be established, the vessel was not in all respects seaworthy. It was not reasonably equipped and supplied at the beginning of the voyage, and therefore the loss caused was not one incident to the perils of the sea. The burden of proof is on the vessel to show that she was in all respects seaworthy at the time she cleared. The rule is thus stated by Justice Wallace, speaking for the court, in The Frey, 45 C. C. A. 309, 106 Fed. 319:

"When goods in the custody of a common carrier are damaged after their receipt and before their delivery, there is a prima facie presumption that the carrier was at fault."

The Elphicke encountered a gale on Lake Erie abreast of Middle Ground, between Point Pelee and Pelee Island. Its velocity is in dispute. Some witnesses put it as high as 60 miles per hour. It was not an extraordinary gale for that season of the year on the Great Lakes, although its severity tested the seaworthiness of the Elphicke. The wind varied from south to southwest; the course of the ship being east by north half north; the wind and the sea bearing on the starboard quarter. The captain testifies that it was about 10 o'clock in the forenoon of November 5th when the seas came over the ship forward of the boiler house. The bulwarks were 18 inches high, solidly built, with scuppers. The scuppers failed to free the ship of the water. She reversed her course and sheltered under Pele

Island. The severity of the wind caused a breakage of the window in the pilot house 20 feet above the surface of the water, and washed in the forward bulwarks. The second after-hatch cover was twisted. The water stood on her deck almost continually between the bulwarks for the space of five hours. On the next day, while the ship was sheltered at Pelee Island, the captain observed that the butts around the hatch coamings and water ways had started. The oakum had started, and, it seems, had the appearance of having been started during the storm. The captain further testifies that the leakage was attributable to the strain from the pitching of the vessel. In this he is corroborated by others of the crew. A careful examination of the testimony, however, satisfies me that the damage to the cargo was not proximately due to this cause. I do not think she suffered a strain so unusual as to result in the opening of seams to the extent of damaging 6,000 bushels of flaxseed. I incline to the belief that the Elphicke, starting on her voyage at that season in the manner in which she was laden, was not in a condition that can be regarded as reasonably safe, under all the conditions in the case. The evidence of the libelants justifies the finding that the strong backs, hatch coamings, and hatch covers were insufficient and defective. Failure to adequately protect cargo during the storm was a consequence. The trip was made at a time when navigators on the Great Lakes and owners of vessels are required to use great care against the inclemency of weather bordering on the close of the navigable season. Such severity of weather in that season of the year on the Great Lakes is presumed to be well known to mariners. The Elphicke is 272 feet keel, 42 beam, and was loaded to a depth of 16 feet, with a capacity for 17½ feet. During the previous season she was engaged in transporting iron ore, and it may reasonably be presumed from the evidence that while so engaged her hatch coamings and covers suffered from usage in loading and unloading. This the owners thereafter failed to repair. The tarpaulins alone, assuming them to be sufficient, failed to offset this injury and defect, by reason of their improper battening. She was calked and overhauled in 1895, immediately prior to engaging in the ore trade. Witness Watterson, for respondent, testifies that after unloading at Buffalo she was examined by him at Cleveland, and in his opinion the oakum and butts had started, due to the storm which she encountered on her trip to Buffalo from Duluth. Doubtless this is true, but, as we have seen, the damage to the cargo was most apparent immediately under the respective hatches. It must therefore be found that the chief contributory cause of the damages sustained was the lack of sufficient protection to the cargo, in the construction of the hatches of the vessel. I am well satisfied by the evidence that she was not reasonably fit at the commencement of the voyage, laden as she was, to encounter gales of wind and storms that are known to prevail at that period of the navigable season. Hughes, Adm. p. 57; The Aggi (D. C.) 93 Fed. 484; The Queen (D. C.) 78 Fed. 155; International Nav. Co. v. Farr & Bailey Mfg. Co., supra. The owner should have exercised great diligence to ascertain her condition, and to have guarded against the occurrence of damage to those who intrusted their property for

safe transportation to the vessel. Had such diligence been exercised, the security of the cargo, in my opinion, would not have been impaired.

The evidence shows that the amount of damaged grain was 6,126 bushels; that its market value at Buffalo at the time of loss was 79⅝ cents per bushel. This amount is based upon the average of the prices shown by the evidence to be the current market price at Chicago, with freight charges, etc., added to fix its reasonable value at Buffalo. This fixes its total valuation at $4,877.82. It appears that the damaged grain was sold for $1,546.81. These proceeds will be regarded as held by the shipbrokers, Brown & Co., as agents for libelants, and the libelants may recover the balance, $3,331.01, with interest from January 9, 1897, together with costs. Let a decree be entered accordingly.