### THE ROKEBY.

#### (District Court, S. D. New York. October 29, 1911.)

1. SHIPPING (§ 132*)—ACTION FOR LOSS OF CARGO—BURDEN OF PROOF—PRIVATE CARRIER—"COMMON CARRIER."

    A vessel loaded entirely with the cargo of one shipper is not a "common carrier," and proof of loss of cargo alone does not cast upon her the burden of proof to show proper stowage; but the cargo owner must prove the negligence affirmatively.

    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471–487; Dec. Dig. § 132.*

    For other definitions, see Words and Phrases, vol. 2, pp. 1313–1319; vol. 8, p. 7607.]

2. SHIPPING (§ 123*)—LOSS OF CARGO—NEGLIGENCE—STOWAGE.

    A deck load of coke placed in two bins at either end of a steamer was in part lost during a gale in the Gulf of Mexico. The sides of the bins were constructed with stanchions of gumwood, 18 feet long and 2½ feet apart, supported at the bottom against the bulwarks. The tops of the stanchions were not at first lashed together across the bins, but some of them were so lashed after the rolling of the vessel had caused them to spread outward a few inches; and afterward parts of the bulwarks gave way, allowing some of the coke to be lost overboard. *Held*, on the evidence, that there was no negligence in the stowage which rendered the vessel liable for the loss as a private carrier, either because of the use of gum instead of pine for the stanchions, which was customary, or because they were not lashed, which was not usual, and it further appearing that the bins as made were more than usually strong.

    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 454, 455, 466; Dec. Dig. § 123.*]

In Admiralty. Suit by the Pocahontas Coal Company against the steamship Rokeby and the Munson Steamship Company, charterer. Decree for respondents.

This is a libel in admiralty against the steamship Rokeby, brought by the Pocahontas Coal Company for the loss of part of a deck cargo of coke on the 7th of December, 1908, in the Gulf of Mexico, on a voyage from Newport News to Tampico, Mexico. The Munson Steamship Company was the charterer of the steamship Rokeby, and had accepted a cargo of coke from the libelant to occupy the whole of the vessel upon the voyage in question; the bill of lading especially providing that the coke should be stored both under and on deck. The Rokeby is what is known as a "three-island ship." She has two wells, forward and aft, upon which the deck cargo may be stored. The method adopted in the case at bar was as follows: Along the side of each well were located stanchions of gumwood, 4 by 6 inches in width and thickness and about 18 feet in height. These were 2 feet 6 inches apart; the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

longer dimension of the section of the stanchion being set athwartships. The base of each stanchion was set some 6 inches inboard from the inner side of the bulwark, and the stanchion was fastened by a wooden cleat to the top of the bulwark at a height of 3 feet from the deck; the remainder going free into the air. Inch planking was nailed horizontally on the inside of the stanchions, so that two sides of a bin were formed on either side of the ship. The forward and aft sides of the bin were made in the same way, thus inclosing the whole space of the well. The winches and mast in the forward and after wells were protected by a smaller bin inclosed within the larger, and the coke was piled into a space between the outer and inner bins so made. The total deck cargo was 1,120 tons, piled to a height of about 15 feet above the deck. The stanchions were held at the base by the weight and compactness of the coke itself, and the whole side was kept from going overboard by the steel bulwarks of the ship. The bulwarks were secured by braces, 3 feet 6 inches long, which were of steel, about 5 feet apart, or less, riveted into the steel deck.

The vessel had fair weather after leaving Newport News until Sunday, the 6th of December, when she was in the Gulf of Mexico on a course somewhat south of west, at which time she encountered a moderate breeze and heavy beam seas from the north. This caused her to roll heavily in the trough of the sea, and some of the stanchions on the port side of the after well began to bulge over the bulwark to the amount of 6 inches at the top. In order to prevent this from going any further, these were lashed with wire lashings across the top athwartships, using the winches to make them tight. On Monday the breeze freshened into a gale, and on the evening of that day, at about 8 o'clock, the wind became a whole gale, causing the steamer still more to roll. At about 8:30 the port bulwark on the after deck gave way altogether, and let overboard about 30 per cent. of the coke, carrying away the stanchions and coke together, and tearing the entire bulwark, so that it was well over the side of the vessel. This caused the vessel to list heavily to starboard, which broke the bulwark on the forward starboard well, throwing out about the same proportion of coke on that side. The steamer then righted herself and proceeded to Tampico, where she discharged the rest of her cargo.

Blodgett, Jones & Burnham, of Boston, Mass., for libelant.

Haight, Sandford & Smith, of New York City, for Munson Steamship Co.

Convers & Kirlin, of New York City, for claimant.

HAND, District Judge (after stating the facts as above). [1] The libel seeks to charge both the charterer and the ship, on the theory that the cargo was improperly stowed. As this is a case where the whole ship was occupied by the shipper, she is not a common carrier (The Fri, 154 Fed. 333, 83 C. C. A. 205), and the proof of loss alone does not throw any burden upon her to show there was no negligence in the stowage, but the libelant must show the negligence affirmatively. To meet this the libelant asserts that the stanchions were made of improper wood, and that they should have been lashed before the steamer started. On the first point it appears that gumwood is a very tough and springy kind of wood, which has not the same stiffness as pine, but will not break under the same pressure. The theory of the libel is that, had pine been used and the stanchions lashed across the ship, the stanchions could not have bent out and so produced a breaking strain on the bulwarks. Either one of two kinds of lashing should have been used, it is urged. First, the top should have been lashed across, which is usually done by running on the outside of the stanchions a piece of timber, forward and aft, on either side, and

then lashing between them several times across the top of the cargo. The other, known as the "soul and body" method, puts the lashings through the cargo and halfway up on the unsupported and exposed portions of the stanchions. As to this "soul and body" method, it was not devised or used until some time after the accident in question, and it cannot be within the precautions properly to be expected. I shall dismiss it, therefore, from the case.

[2] The first question, therefore, to be answered is whether, assuming gum stanchions to be used, and to be set two feet six inches apart, they should have been top-lashed when the master left port. It is quite true that the bin sides were unusually strong in the Rokeby; for the stanchions were nearer together than usual. As they were made of tough wood and were so re-enforced, they were much less likely to give way than pine stanchions spaced at four feet. Thus they placed an unusual strain upon the bulwarks, and it is, perhaps, on that account that they gave way. Hargreaves, the libelant's witness, thinks that either the stanchions should have been lashed, or should have been spaced more widely, so as to insure their breaking before the bulwark. The question of the character of the wood I shall come to later. It may be that to do either of these things would have saved the bulwark; but to let the bin sides break would have spilled some of the cargo anyway, and it is impossible to say how much more the libelant has lost than it would have lost in that case. Therefore the only complaint in the least material here is for the failure to top-lash the stanchions; for, as I have said, "soul and body" lashing is out of the case. This is no more than to ask how far the master should have anticipated danger to his bulwarks from the unusually strong bin sides which he carried. I do not find that Hargreaves suggests that he always top-lashed, before he used his "soul and body" lashing. Rather I infer that he preferred to make his bins weak enough to go by the board. It is true that he now thinks top-lashings desirable in the interest of the bulwarks, and upon the fact, if the case turned upon it, I should agree with him; for it seems pretty clear that they would help the bulwark, whether or not there was a bulge between the lashing and rail. However, the question is not whether they would help the bulwarks, but whether any one ought to have been afraid for the bulwarks. Their cargo was not a large one; it was smaller than had been intended, and smaller than many others that had been safely carried with similar fittings. Theretofore the only apparent danger had been to the stanchions, and it was on that account that they had been more closely spaced. No bulwark had ever broken; and, while that is, of course, not conclusive, it is a very important consideration when the question is only of ordinary human caution. Moreover, many cargoes, perhaps a majority of the cargoes, had gone out unlashed. I think it is a fair inference that such as were lashed were lashed rather with a view to protecting the stanchions than the bulwarks. Some of the witnesses still think that is the chief purpose of top-lashings. If so, when the Rokeby went out with such strong bin sides, she had already provided against the danger against which top-lashing was meant to protect; and her master

should not be held liable for not thinking of his bulwarks. If he had, he would have been, perhaps, peculiarly commendable; but all the law requires of him is ordinary caution, and that he certainly showed.

The libelant urges that from any point of view gum was an improper wood to use, because it is pliable and will throw a thrust upon the bulwarks, even if it be top-lashed. There is some dispute as to whether or not its pliancy does not serve to accommodate the bulwark to the shock of the momentum of the cargo in a rolling sea; but I do not find it necessary to determine that question, which is somewhat obscure. It is enough that gumwood was in the most general, if not universal, use for precisely this purpose at Newport News, and, indeed, at times elsewhere. It was extremely tough, and had a much higher breaking strength than pine. From the point of view of past experience with breaking stanchions, it was especially desirable, since pine would break. Here, again, Hargreaves thinks that its toughness made it dangerous to the bulwarks, even when lashed; but his judgment upon that, like his judgment upon arranging and securing the stanchions, either arises after the event, or was not generally shared by mariners. In the face of such a general usage, I cannot find that the wood was inherently dangerous.

Finally arises the question of the master's conduct after the stanchions showed signs of weakness on December 6th. He then lashed together the threatened stanchions, leaving the rest. No one knows at what point the bulwarks broke; but we must suppose that none of the stanchions did, else the bulwarks would have been relieved. At least, that was the most likely way in which the accident happened. If the bulwarks broke at the point of the lashed stanchions, then it was an accident quite unavoidable; for Hargreaves himself concedes that a bulge of six inches at the top of the stanchions is not serious, if checked by lashings, and if the coke does not work down to bulge out the stanchions below. Now, if the bulging stanchions were lashed, in so far as they bulged below, if at all, it was due to the character of the wood, which, as I have said, it was nevertheless reasonably suitable to employ. Therefore, as to those stanchions, the captain had done all that could in any case be expected of him, and had done it before any serious change had taken place to his detriment. If, on the other hand, the bulwarks broke at the point of the unlashed stanchions, at least they had shown no signs of bulging; and there was no more reason to apprehend danger from them than there had been at the commencement of the voyage.

The accident appears to have happened either because, from some unknown cause, the bulwarks were weaker than is usual in such ships, or because there was, as Judge Wallace says in The Frey, 106 Fed. 319, 324, 45 C. C. A. 309, 313, " 'an unlucky twist' in seas not extraordinarily rough." If a shipper wishes to protect himself against such accidents, he must insure; for they are not fairly a subject for the assessment of damages upon the basis of some one's negligence.

Libel dismissed.