WRIGHT v. W. R. GRACE & CO.

(District Court, W. D. Washington, S. D. February 24, 1913.)

No. 622.

1. SHIPPING (§ 121*)—DAMAGE TO CARGO—LIABILITY—UNSEAWORTHINESS OF VESSEL.

On the voyage of a sailing vessel with a cargo of cement from Antwerp to Puget Sound ports around Cape Horn, occupying more than six months, the cargo under the main hatch was damaged by sea water. The hatch was caulked between the cover and coaming and between the sections of the cover, but the seams between the planks forming the sections were not caulked, and there was evidence that they were open. The hatch was also covered with three tarpaulins, which were not removed during the voyage, although at one time they blew partially off and the evidence tended to show that at that time the water entered through the seams in the cover. The weather was not worse than was to have been anticipated. *Held*, that the damage was not due to a peril of the seas, or other cause within the exceptions of the bill of lading, but to the unseaworthiness of the vessel at the beginning of the voyage because of the defective hatch cover, and to the negligence of those in charge in not properly caring for the cargo by removing the tarpaulins during the voyage and renewing them if necessary, for both of which the owner was responsible.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 225, 449–451, 466; Dec. Dig. § 121.*]

2. SHIPPING (§ 132*)—DAMAGE TO CARGO—BREAKAGE—BURDEN OF PROOF.

Under a bill of lading exempting the carrier from liability for loss by breakage, unless occasioned by improper stowage, the burden of proof rests on the shipper to establish such liability.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471–487; Dec. Dig. § 132.*]

In Admiralty. Suit by William Wright, as master of the British bark Gulf Stream, against W. R. Grace & Co. Decree for respondent on cross-libel.

Ira A. Campbell, of San Francisco, Cal., for libelant.

James M. Ashton and Huffer, Hayden & Hamilton, all of Tacoma, Wash., for respondent.

CUSHMAN, District Judge. This cause is now before the court for decision, after trial, upon the merits. The suit is a libel in personam, by the master of the British bark Gulf Stream against respondent to recover an unpaid balance for freight earned under a certain charter party, entered into with respondent, to carry a full cargo of cement and lawful merchandise for shipment from Antwerp to Seattle and Tacoma. There is no question as to this amount. The delivery of the cargo is alleged in good order and condition, "with the exception of such portions of said cargo as were damaged from dangers or accidents of the sea." Respondent, answering and by cross-libel, sets up an offset against libelant, alleging that the charter party warranted

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"the said vessel being kept tight, staunch, strong and in every way fitted for the voyage"; and, further:

"That in the course of such voyage the said vessel met with such winds and weather as are ordinarily encountered thereon, and, by reason of the unseaworthy condition of said ship at such times, the water which boarded said ship during such ordinary weather entered through the main hatch of said ship, which was constructed so that there were large open spaces in the seams of such hatch, which in no manner were caulked or protected, and that by reason of the neglect on the part of the master of said bark, her owners and crew, to provide a hatch which would prevent the waters of the sea from passing through the same, a large quantity of the cargo of cement stowed and situated under said hatch became greatly damaged by the sea water which entered through the uncaulked and unprotected seams of said hatch."

That a number of barrels of cement, through the negligent handling by the libelant, were destroyed and lost and others damaged so that they had to be recoopered.

The voyage was a long one, requiring the ship to pass twice through the Tropics and through the stormy region of Cape Horn in midwinter. The evidence taken shows that the main hatch was caulked with oakum between the hatch cover and the coaming of the hatch and between the sections of the hatch cover; but there was no caulking of the seams between the plank, or boards, forming the sections of the hatch cover. Neither were these seams covered by tarred strips of canvas or otherwise. The hatch covers were not removed during the voyage. The main hatch was covered with three tarpaulins, battened down over the plank of the hatch cover. These tarpaulins are described by the libelant as "one new, one six months old, and one in fairly good condition." After rounding Cape Horn, the tarpaulin over the main hatch had a corner torn off. The libelant testifies, "During the night, the main hatch tarpaulin washed off and tore out a corner." Again, when asked if it carried off a portion of the tarpaulin, he answered: "That we do not know, sir. Something may have struck it." This hatch cover was old and patched. It had graving pieces in it. Libelant did not show the actual age of the hatch cover.

The old hatch covers were replaced by new ones before the ship went out on her return cruise, after the delivery of this cargo. The fore and after hatches were smaller than the main hatch. In heavy weather, water came aboard about the main hatch and was carried aft. Each of the other hatches was caulked in a different manner than the main hatch. The tarpaulins on the forward hatch were in better condition than those on the main hatch. There was testimony that it was usual on long voyages of this character to remove the tarpaulins occasionally during the voyage and replace. When the hatch covers were removed at the end of the voyage, there were numerous cracks observable between the planks of the hatch cover; the witnesses differing as to the number and size. There is some testimony that they were as wide as an eighth of an inch. There was testimony on behalf of libelant that the caulking between the sections of the hatch cover, and between the coaming of the hatch and the cover, would close these cracks, and that, with the tarpaulin over the hatch cover and battened down, would make the hatch and cover tight, staunch, and seaworthy.

On July 1st, when the ship was 180 miles south of Cape Horn, in a severe storm, a skid stay was carried away, drawing the bolt, by which it was fastened, through the deck, making an opening which allowed water to pass through the deck onto the cargo. The morning after the tearing of the corner of the tarpaulin, one of the starboard bulwark stays was discovered to have drawn, breaking the palm with which it was fastened to the deck, thereby allowing the bolts to drop out and leaving holes through the deck. Owing to the conclusion which the court has reached, it is not necessary to determine whether the drawing of these stays would constitute a danger or peril of the sea, within the exception in the bill of lading, as contended by libelant. There is a question, under the testimony, when this stay broke. The holes left by the carrying away of the skid stay and the starboard bulwark stay are described as being three-quarters of an inch, or slightly more, in diameter.

Libelant relies upon the following authorities: The G. R. Booth, 171 U. S. 450, 19 Sup. Ct. 9, 43 L. Ed. 234; Milwaukee & St. Paul Ry. Co. v. Kellogg, 94 U. S. 469, 74 L. Ed. 256; Gough v. Hamburg Amerikanische Packetfahrt Aktiengesellschaft (D. C.) 158 Fed. 174; The Patria, 132 Fed. 971, 68 C. C. A. 397.

Respondent relies upon the following authorities: The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181; Dupont v. Vance, 19 How. 162, 15 L. Ed. 585; The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688; The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 69; The Mississippi (D. C.) 113 Fed. 985; The C. W. Elphicke (D. C.) 117 Fed. 279, affirmed 122 Fed. 439, 58 C. C. A. 421; The Mangalore (D. C.) 23 Fed. 462.

[1] The bill of lading provided for the delivery of the cargo in good order and condition at Seattle, subject to certain exceptions, among others:

"The act of God, * * * the neglect and default of pilot, master, or crew, in the navigation of the ship, and all and every danger and accidents of the seas, rivers and navigation, of whatever nature or kind, are excepted. The ship is not liable for * * * breakage, * * * unless occasioned by improper stowage."

Despite the fact of the breaking of the skid stay and bulwark stay, it is apparent that no extraordinary storms were encountered upon the voyage, or any weather more severe than should have been anticipated. No damage is shown to have been suffered by the deckhouses or other permanent parts of the vessel. It also appears that the tarpaulin was torn from the hatch after passing through the severest storms encountered.

It is libelant's contention that the water leaked through the holes in the deck, left by the tearing out of the stay at the side of the ship. There were certain I-beams, forming a part of the cargo, immediately beneath the deck. It is further contended by libelant that the water passed through these holes, fell upon and ran along one or more of these I-beams, as in a trough, to the hatch, where it was discharged upon the cement. This contention cannot be sustained. The fact that practically all of the cement within the entire square of the hatch

was ruined overcomes the evidence, if any, supporting libelant's contention.

Libelant's contention that the caulking done around the hatch cover and between its sections would have the effect of closing all the seams in the cover is not persuasive. The seams, it is shown, open with the shrinking of the planks. It is therefore not clear, as each plank would shrink, how such caulking would close all of the seams, particularly those in the middle of the sections of the hatch cover.

There was evidence to the effect that on English ships it is not customary to pitch the seams between the sections of the hatch cover, but on American ships it is customary. No other reason is apparent for caulking between the sections of the hatch cover than to keep out the water, and, with the open seams in the sections of the hatch cover, the same course would appear necessary, as the water would enter through either.

From the evidence, it appears that the cause of the damage to the cement was that the tarpaulin came off, or was torn off, from over the hatch cover, and that the salt water entered the vessel and reached the cargo of cement through the cracks and seams of the hatch cover. The hatch cover and tarpaulin, together, served one purpose—to exclude the water. If one was defective—without which, the damage would not have occurred—this defect would be the proximate cause of the damage.

The libelant has not maintained the burden upon him of showing that the damage to the cement, by salt water's finding its way below decks, resulted from a peril of the sea. The Patria, 132 Fed. 971, 68 C. C. A. 397.

It is concluded from the evidence that the hatch cover, on account of its age and the open seams therein being uncaulked, unpitched, or otherwise stopped, was defective and the ship unseaworthy by reason thereof, at the commencement of the voyage. It is further concluded that the libelant was negligent in caring for the cargo, in not removing the tarpaulins for inspection and renewal, if necessary, during the voyage and prior to the damage to the cement.

In an ordinary voyage, such a precaution would be, doubtless, unnecessary; but, on a voyage of this character—six months or more in duration, where the vessel passed twice through the heat of the Tropics and through the storms and cold of midwinter of Cape Horn —ordinary care would have required the removal of the tarpaulins and their renewal or readjustment. Besides the ordinary wear of the tarpaulins over the edge of the hatch coaming, the water passing across the hatch would have a wearing effect, also, and, if the tarpaulins were frozen in cold weather, they would part very easily. Whether this is the true explanation of the tarpaulin's tearing over the corner of the hatch, or not, is not clear; but the existence of these conditions required greater care than was taken. The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688. This condition, alone, would make a vessel unseaworthy.

Cement is shown to be particularly liable to damage from moisture. To be seaworthy, it is necessary that a vessel should be fit to carry

the particular cargo which it undertakes to carry. The Southwark, 191 U. S. 1, at page 7, 24 Sup. Ct. 1, 48 L. Ed. 69.

The conclusion having been reached that the ship was unseaworthy at the commencement of the voyage renders it unnecessary to consider the provisions of the Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946). The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644; The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181; The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 69.

[2] Respondent's cross-libel is sustained to the amount of 320 barrels of cement found to have been totally destroyed by salt water; but respondent has not sustained the burden of establishing the liability of libelant for the breakage of certain other barrels of cement. Under the terms of the bill of lading, this burden rests on respondent. The Patria, 132 Fed. 971, 68 C. C. A. 397.