### DAVIDSON S. S. CO. v. 119,254 BUSHELS OF FLAXSEED.

#### (District Court, W. D. New York. June 13, 1902.)

1. SHIPPING—DAMAGE TO CARGO—SEA PERILS.

    Damage to a cargo of flaxseed on a voyage from Duluth to Buffalo, caused by water, *held* not to have been due to unseaworthiness of the vessel at the commencement of the voyage, but to dangers of the sea, against which the carrier was protected from liability by the conditions of the bills of lading; it being clearly shown that the vessel, which was new, had been recently overhauled, and was in every respect in the best condition and properly equipped, having the highest rating, and it being further shown that on the voyage she encountered unusually severe gales and heavy seas, which caused her seams to start, from the strain.

2. SAME—LIEN FOR FREIGHT—DELIVERY OF CARGO IN WAREHOUSE.

    A vessel, by delivering her cargo of flaxseed in a warehouse at the end of the voyage, and taking a receipt therefor, which was retained until a libel was filed, did not thereby lose her lien on the cargo for freight.

In Admiralty. Suit to enforce lien on cargo for freight.

George Clinton, for libelant.

Harvey L. Brown, for claimant and respondent.

HAZEL, District Judge. A libel was filed in this proceeding against 119,254 bushels of flaxseed, cargo of the steamer Orinoco, by the Davidson Steamship Company, a Minnesota corporation, to recover the sum of $1,646.87 freight. The cargo was consigned to Spencer Kellogg, of Buffalo, N. Y. It was taken on board the Orinoco pursuant to bill of lading at the port of Duluth, Minn., on or about November 6, 1900. The Orinoco had in tow the Abyssinia, a lake barge having a capacity of 25,000 bushels of wheat. The respondent, owner of the flaxseed, claims that 513 bushels of the cargo, valued at $1.88 per bushel, were damaged when the carrying vessel arrived at her port of destination, by reason of her unseaworthiness when she commenced her voyage. He seeks to recoup in this action

¶ 1. Loss by perils of the sea, see note to The Dunbritton, 19 C. C. A. 465.

the sum of $759.25. I have carefully examined the proofs, and have become satisfied that the vessel was reasonably seaworthy and fit to carry the cargo which she undertook to transport, and therefore the libelant is entitled to recover freight on the entire cargo delivered by it to the respondent at Buffalo, N. Y. I am well convinced that the libelant, owner of the ship, has maintained the burden which the law imposes,—to prove that the damage was sustained by causes over which the owner of the ship had no control, and for which, therefore, it cannot be held responsible. The question presented is whether, in view of the terms of the bill of lading, 'which provide for the delivery of the cargo in good order, "the dangers of the sea only excepted," the damage sustained to the cargo is attributable to such dangers, or to unseaworthiness of the ship at the inception of the voyage. The Orinoco was a first-class wooden vessel, built in Bay City, Mich., in 1898. She sustained damage in September, 1900, in consequence of a fire, and was immediately thereafter overhauled, examined, calked, and placed in good condition. She was rated A1 star,—the highest class that can be given an inland vessel,— and was so rated at the time she was laden with cargo consigned to the respondent. It is admitted by respondent that she was in all respects strong, stanch, and well fitted for carrying large quantities of iron ore or coal on the Great Lakes. The theory upon which respondent predicates unseaworthiness at the time of the commencement of the voyage is that she was not fitted for carrying flaxseed, by reason of defects of construction, which resulted in quantities of water leaking on the cargo through the hatch covers, and other places hereinafter more particularly specified, during gales encountered on Lakes Superior and Erie. The captain of the Orinoco testifies substantially that before leaving Duluth, on or about November 6, 1900, he made the usual and customary examination of the vessel to ascertain her condition. He says he gave special attention to the hatches. They were covered by extra-heavy No. 2 tarpaulins, which were bought and put in use after the fire in the preceding September. The mate secured the hatches before leaving, and he gives evidence on the trial corroborative of Capt. Starkey, and tending to show that the hatches and tarpaulins were in good condition. The efficiency of the tarpaulins which were designed to protect the cargo from leakage is not seriously disputed. In this respect, therefore, the duty of the vessel was properly performed. On the night of November 7th, when the ship and her consort were off Eagle Harbor, Lake Superior, 191 miles from Duluth, in consequence of the turbulency of the lake, produced by a gale, the Abyssinia broke the steel cable by which she was being towed. She anchored near the beach. She was taken off the succeeding morning by the Orinoco, assisted by a tug. The gale lasted 24 hours. Some witnesses put its length at 40 hours. The Orinoco pitched, tossed, and rolled from side to side. The velocity of the wind was 40 miles per hour. The witnesses for the libelant say that the gale was a very severe one, and the strength of the vessel was sharply tried. The seas came over her bow and flooded her deck at intervals while the storm lasted. When the vessel arrived at Sault Ste. Marie, a delay of four days ensued, by reason

of needed repairs to the Abyssinia's rudder, injured by the stress of the gale. The Orinoco suffered no harm. Two small pine plugs under the collar of the hawse pipe dropped out, which resulted in water reaching the chain locker. There was no appreciable damage to the cargo, however, from this cause, at any stage of the voyage. The Orinoco and consort left Sault Ste. Marie on or about the 16th of November, and reached Lake Erie uneventfully on the morning of the 21st, and passed the dummy light at the mouth of Detroit river with a 10-mile southwest wind, which increased in velocity. The vessel began to steer badly about 10 o'clock in the morning. The seas were running high. The Abyssinia again broke her cable. The evidence shows this gale to have been of great force and unusual severity. It was a hurricane. The Orinoco plunged and rolled both before and after the Abyssinia broke her cable. Much water came over her deck. She pitched and strained in her joints. The captains and others of the crew testified that in their opinion the velocity of the wind was 65 to 75 miles per hour, beginning at 2 p. m., to 8 p. m. The wind was from the west. The mate and the engineer, both of whom have had many years' experience on the lakes, say that the gale was the worst in their experience. The official forecaster of the signal service stationed at Buffalo testified that the storm was general, and placed the maximum velocity per hour at 80 miles. Its average velocity per hour, beginning at 2 p. m., was 69 miles; being 68 miles at 3 p. m., and over 60 miles thereafter until 8 p. m. The minimum velocity was 38 miles at 11 a. m. As a result of the straining of the Orinoco's joints, her oakum started in and around the hatches. When the vessel arrived at Buffalo it was ascertained that her cargo was damaged underneath the hatches, the boiler house, chain locker, and around the foremast. Her appearance indicated that her seams had opened in parts and places. Evidence was offered by the respondent which tends to show that bolts in the battens were too far apart; that this condition in the hatch covers made it possible for water to make its way over the coamings underneath the battens and tarpaulins. The battens were fastened 33 inches apart. I do not regard that it was essential to the seaworthiness of the ship that they should have been closer. The testimony justifies the assumption that the coamings, tarpaulins, and hatch covers were proper and adequate, and that the manner of fastening the battens was sufficient to keep the tarpaulins snug and tight. Surveyors were appointed by the claimant on the arrival of the vessel at Buffalo to ascertain the extent of the damage and the cause thereof. Their testimony tends to show, further, that a contributory cause was the faulty construction of the chain locker; that no proper provision was adopted to carry off, or prevent from entering the cargo, water which might penetrate the compartment. Much testimony was given by both sides on this point. It does not clearly appear that the water reached the cargo from the chain pipes by way of the chain locker. The libelant contends that it came through the hawse pipe during the Lake Superior gale which caused displacement of plugs in the hawse-pipe collar. Some of the water came from that source. It was prevented from getting into the cargo by temporarily stopping the flow.

No liability attaches from this alleged defect. It is shown with singular clearness that the master of the vessel performed his full duty in this regard. The displaced plugs were due to stress of weather. The gale on Lake Erie was extraordinarily severe. Indeed, it would have been astonishing if every conceivable part of the ship had proved impenetrable to the water which rolled over her. The claim of defect in the mast in the forward and starboard side, and that improper air or ventilator pipes aft contributed to the damage, does not persuade me. No decay extended over enough surface or was of such depth or character as to cause a leak in an ordinary storm. The mast was properly wedged. If water penetrated the cargo at that point, it is evident that it was produced by the straining and twisting of the vessel. Judge Wallace says in The Sandfield, 34 C. C. A. 612, 92 Fed. 664, that the test of seaworthiness is to be determined whether the vessel was reasonably fit for the contemplated voyage. He cites as authority The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241. It is not claimed here that there was error in the management of the vessel through negligent omission or commission in the use of the vessel's equipment. The respondent rests his contention on the claim of unseaworthiness at the time of the commencement of the voyage. The proof, however, is abundant and satisfactory that the Orinoco at the time when she contracted to transport the cargo in question, and when she left the port of Duluth for the port of Buffalo, was reasonably equipped and fit to carry out her assumed obligations as common carrier. She was stanch, strong, and well equipped to withstand the ordeals of the weather prevailing at that season. I think that due diligence was exercised by her owner to make her in all respects seaworthy. Her officers and crew performed their full duty in her management. The case comes within the rule laid down by the supreme court of the United States in The Silvia, supra, as illustrated and explained in International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 Sup. Ct. 591, 45 L. Ed. 830. After the September fire already alluded to, the burned material was removed and replaced by new decks, beams, coamings, and ceilings. The decks were calked, seams repitched, the boiler, which was of steel, properly secured and riveted, and other extensive repairs made. This must be regarded as strong evidence persuasive of her seaworthiness. I find no analogy to the case of The C. W. Elphicke (tried before this court at the same term) 117 Fed. 279. In that case there was a manifest defect in the hatches at the commencement of the voyage, and the tarpaulins, necessary equipment of a seaworthy vessel, afforded no adequate protection.

No claim is made that the lien for freight cannot be held because of the conditional delivery of the cargo. Witness Farrell testified on this point that it is customary to elevate grain immediately on its arrival, and then a ticket is issued to the vessel agent, who indorses it on the issuance of the warehouse receipt, which is delivered to the consignee upon payment of the freight. The warehouse receipt was not delivered to the consignee because of his refusal to pay freight charges. The libel was filed immediately, and the marshal delivered possession of the cargo to the consignee on filing a stipulation. On the facts proved, the lien for freight had never been waived or abandoned. Costello

v. 734,700 Lathes (D. C.) 44 Fed. 105; The Giulio (D. C.) 34 Fed. 909.

A decree may be entered for the full amount of freight, $1,648.80, with interest from November 24, 1900, besides costs.