TWEEDIE TRADING CO. v. CLAN LINE STEAMERS, Limited.

(Circuit Court of Appeals, Second Circuit. June 12, 1913.)

No. 240.

SHIPPING (§ 43*)—CHARTER—SUIT BY CHARTERER FOR BREACH.

A steamship *held* not liable to a charterer because of delay caused by the refusal of the master to load a full cargo before crossing a dangerous bar, at a port where there were no tugs, and where stranding would have seriously endangered both vessel and cargo.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 165–168; Dec. Dig. § 43.*]

Appeal from the District Court of the United States for the Southern District of New York.

---

Suit in admiralty by the Tweedie Trading Company against the Clan Line Steamers, Limited. Decree for respondent, and libelant appeals. Affirmed.

Ralph James M. Bullowa, of New York City, for appellant.

Convers & Kirlin, of New York City (John M. Woolsey, of New York City, of counsel), for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

COXE, Circuit Judge. The steamship Clan MacIntyre was chartered to the Tweedie Trading Company by her owner, the Clan Line Steamers, Limited, upon the government form of time charter for one round trip. The steamer was—

"to load and/or discharge at safe port and/or ports in the United States (Atlantic-Gulf) for one round trip to the West Indies, and/or Gulf of Mexico, and/or Caribbean Sea, and/or Venezuela, and/or Guiana, and/or Central or South America east coast, but not south of Demerara."

The first controversy between the parties relates to the price of coal, 170 tons, on board the steamer when she was delivered to the libelant at Philadelphia. It was the duty of the libelant to pay for this coal at the current market price at Philadelphia. The libelant was charged $3 per ton and the trial judge held that this was a fair price for coal "delivered in the stream, laden on board and trimmed in the bunkers."

The charter provided for the delivery at the designated port, which was Philadelphia, and the agents for the libelant and respondent signed a certificate in which they agree that the vessel's time "commenced 1 o'clock p. m., Thursday, November 8, 1906, at the port of Philadelphia, with 170 tons of coal in bunkers." The respondent was not required to deliver the vessel at the coal chutes or at any particular dock and the price of coal was to be fixed not in relation to any particular dock, but according to its market value at Philadelphia. There was a difference of opinion upon this point among the witnesses, some placing the price as high as $3.25, others as low as $2.55, depending upon the place of delivery. It appears that at Philadelphia a coal carrier at the chutes is given a lower price for bunker coal than a vessel carrying general merchandise.

The District Judge, who saw most of the witnesses, was better able than an appellate court to solve this question of fact and we find no error in his conclusion that $3 per ton was a fair price for the coal in the bunkers.

The libelant's claim for delay at Laguna, from December 2d to December 8th, cannot be sustained. In fact, we think the conduct of her master in this regard was not only prudent but to be commended. The MacIntyre was probably the largest vessel that had ever crossed the bar at this port, and the master was justified in taking every precaution to prevent her from grounding, where, owing to the fact that there were no tugs to assist her and where violent storms were to be expected, serious results were certain to follow if she got aground. Although the witnesses do not agree as to the exact depth of water on the bar, they all agree that it was perilously near the draft of the MacIntyre even at high water and that her flat bottom construction made

it much more dangerous for her to attempt to cross than for an ordinary round bottom ship. We agree with Judge Hough in the following statement:

"It is also obviously more dangerous and expensive for a vessel to go aground laden with cargo than it is when light. The steamship's master had been instructed by libelant's letter of November 12, 1905. to come out of Laguna on 'an exact even keel,' and when his ship was loaded to the depth of 12 feet on an even keel he refused to take on any more cargo. In my judgment he was not only excusable but praiseworthy for doing this. No charter party required him to hazard his vessel, and according to libelant's own showing he was expected to go on an even keel with a loaded ship over a mile of bar, dragging for an unknown portion of the way through six inches of mud or sand, with a flat-bottomed vessel whose propeller was quite half out of. water. It seems to me that the statement of this proposition is its own refutation."

The decree is affirmed with costs.