## THE ROSALIE HULL.

(Circuit Court of Appeals, Second Circuit.
February 2, 1925.)

No. 150.

1. **Shipping ⟨⟩132(5)—Evidence held to prove damage from sea water due to severity of storm, and not unseaworthy condition of vessel.**

In libel for damage to coffee from sea water, evidence *held* to prove that vessel was seaworthy at outset of voyage, and that damage was due to severity of storm, and therefore to peril of sea, relieving ship of liability.

2. **Shipping ⟨⟩121(1)—Damage from sea water to coffee due to severe storm, and not unseaworthy condition of vessel, not chargeable to ship.**

Where vessel was seaworthy in every particular at outset of voyage and the damage to coffee by sea water was due to so severe a storm that it may be properly regarded as a peril of the sea, the ship was not liable.

3. **Shipping ⟨⟩132(3)—Carrier has burden of showing connection of damage from sea water and exception against sea perils.**

Carrier has burden of showing connection of· damage from sea water and exception against sea perils.

4. **Shipping ⟨⟩125 — Necessary "deviation" held not to affect relations or obligations of vessel.**

Where bill of lading gave vessel discretion to deviate from usual course, and where it was necessary for vessel to deviate from course to replenish supplies and repair sails, there was no deviation affecting relations or obligations of the vessel, since "deviation" to have such effect must be a voluntary departure without necessity or reasonable cause.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Deviation (In Law of Shipping).]

Appeal from the District Court of the United States for the Southern District of New York.

Libel by Stewart Carnal & Co., Limited, against the schooner Rosalie Hull, her tackle, etc.; the Georgia Shipbuilding Company, claimant. Decree for claimant (296 F. 938), and libelant appeals. Affirmed.

Bigham, Englar & Jones, of New York City (Henry B. Potter, George S. Brengle, and Ezra G. Benedict, all of New York City, of counsel), for appellant.

MacFarland, Taylor & Costello, of New York City (Alfred H. Strickland, of New York City, of counsel), for appellee.

Before ROGERS, MANTON, and LEARNED HAND, Circuit Judges.

MANTON, Circuit Judge. This suit in admiralty against the appellee seeks to recover damages for loss and injury to a cargo of coffee which the schooner Rosalie Hull undertook to transport from Rio de Janeiro to New York. She was loaded on November 26, 1918, with 16,000 bags of coffee, and when she arrived in New York on April 24, 1919, the cargo was 792 bags short and much of the cargo was seriously damaged by sea water. In defense, it is asserted that the shortage and damage was due to sea water which resulted from the violent storm the schooner ran into on her voyage, which, it is said, was so severe and extreme as to amount to a peril of the sea which excused the schooner from actionable damages. After leaving Rio de Janeiro on November 26, 1918, the ship was delayed by adverse winds and put into Barbadoes, about one day out of her course to renew her supply of provisions and repair her sails. She left Barbadoes on January 28, 1919, and when she reached a position 250 miles south of Cape Hatteras on February 9th, she struck this violent storm and sustained injury. The fore stay was carried away, and the standing jib was blown off. The seas ran high—so high that the schooner shipped large quantities of water and rolled and pitched violently, and on the morning of February 10th, the seas boarded the port quarter, sprung the rudder head, and rendered it impossible for the schooner to steer her course to New York. She could not heave-to, and she was obliged to follow the wind and was at the mercy of the elements. She proceeded to St. Thomas, where she arrived on the 23d day of February, 1919. At St. Thomas, repairs were made and a survey was held on the cargo by order of the District Court there, by two surveyors, who found that approximately 789 bags of coffee were spoiled and unfit for human consumption. It was thought to be unsafe to leave the spoiled portion on the vessel with that which was sound, and the spoiled coffee was thrown away.

The principal question presented is whether this storm was so violent and severe as to excuse the ship because it amounted to a peril of the sea, or whether the sea water was shipped because of some infirmity in the vessel. The theory of the appellant is that the schooner has not excused herself from liability because she has failed to meet the burden of proof resting upon her to permit of such exoneration. It is claimed that the schooner had been built, during the war time, of green lumber which had been insufficiently cured and dried, and that in passing through the tropical waters the timbers did dry, and this caused the ship to spring leaks which made

her unseaworthy. This, it is said, is the cause of the sea water getting into the coffee and causing this damage. The appellant also claims that putting into the Barbadoes and the delay there was an unjustifiable deviation of the voyage, and voided the bill of lading ab initio and made the carrier an insurer of the cargo.

This schooner was built in Savannah, Ga., and finished in May, 1918. She was a four-masted schooner about 1,250 tons dead weight capacity, 184.5 feet long, 38 foot beam, and 14.7 feet deep. She was classed as 12-A 1 in Lloyds—the highest class for a wooden vessel. The lumber, although not kiln dried, was long leaf yellow pine. It was seasoned for about 11 months and, experts say, properly seasoned. They say that southern pine should not be kiln dried, as this would injure the wood. The lumber is boiled in vats before it is put on, and it is never kiln dried for vessels. The rudder head which was twisted in the storm proved to be of good substantial wood. The fore stay, which broke, was 1½" in diameter and was testified to have been properly made. She was inspected and approved as to construction. She carried some extra sails. The bowports of the schooner, hatches, waterways, scuppers, beams, pumps, and all of her equipment was apparently made in the best modern method and properly tested. There is no question raised as to her construction and equipment other than the claim above as to her being made of green timber. This voyage to Rio de Janeiro was her first. She was in charge of a mariner of 40 years' experience who had been a master of a sailing vessel for 25 years. The balance of the crew were experienced. Both the master and the mate testified that the voyage to Rio de Janeiro was without incident and there were no leaks. The coffee was loaded by an efficient stevedore and was stowed in tiers. The dunnage over the floor was 12 inches, scantling and boards, amidships, and this covered the floor. At the turn of the bilge there were 15 or .16 inches of dunnage. Coffee mats were used for this specific purpose and on the side of the schooner there was matting. The bowports were carefully inspected inside and out and were found to be in perfect condition. After the cargo was aboard, the master examined the hatches, each had two tarpaulins, and he examined the caulking about the coamings and found it to be in first-class condition. The deck pipes were secured with bagging and canvass was tied on top of it. The schooner had three pumps properly located and in good order. It can-

not be doubted that the cargo was properly stowed and that she was in a most seaworthy condition for the voyage. The mate corroborated much of what the master testified, and added that the deck pipes which lead to the chain locker and timber brow in the hold were closed. The hawser pipes were stopped. They were bound by winding sacks around and putting a plug in, and a board was placed across to prevent the plug from coming out. There were three cargo hatches and a small hatch leading to the chain locker, and they were all properly secured. The mate inspected the seams round the hatch coamings and about the deck, and the bowports were inspected on the outside and inside with the aid of a light. He tested the same with a knife, caulking iron, and mallet at Rio de Janeiro. The schooner was equipped with clearing ports so as to quickly and easily clear herself from the seas that broke over, and she had good pumps. She was carefully examined in dry dock after her arrival in New York, and found to be in good condition. She did not need to be recaulked on her hull. Her caulking was pronounced to be in good condition. While in St. Thomas, she was inspected by the surveyors appointed, and they testified that she was properly caulked in every respect, and especially as to her decks and about the coamings and hatches. The schooner then had been out of Rio de Janeiro 49 days and had traveled about 2,800 miles. She did not leak and her pumps were used and bilges sounded as customary. She had struck adverse winds which required double the time for her voyage. Because of this the supplies ran low and the master concluded that it was best to put into the Barbadoes to obtain provisions. It was necessary to repair the sails. The testimony shows that calm weather and adverse winds will cause the sails to rip and start as they shake and slap against the stays. Experts called sufficiently justified this course of the master. To make the repairs to the sails and obtain the necessary provisions required about nine days. The testimony shows that three sail makers from the shore as well as the crew were engaged in the work of restitching the sails and making repairs to a boom, and she was ready to sail, and did so on January 25th. There was no unusual or unnecessary delay in this stay at Barbadoes. The hatches were not removed there, and nothing had happened up to that time to damage the vessel which might tend to make her unseaworthy.

[1-3] After leaving the Barbadoes, there was no unusual occurrence until the 9th of

February, when southward of Cape Hatteras a gale of terrific wind and storm was encountered. The day began with a southwest wind, and the schooner was on a northwesterly course. The wind increased in violence and became a gale. The crew described it as a hurricane of a violent character. The wind shifted from the south to a westward direction causing a high and confusing sea —a cross sea. The velocity of the wind was given as 60 to 70 miles an hour and the sea broke—tons of sea water broke over the deck the full length of the ship. The schooner used oil for about 36 hours. The wind was so severe as to blow a new jib from her. All the sails were taken in, for no sails could be used, until the afternoon of February 13th. During this time the schooner was at the mercy of the wind and sea. This experienced crew gave testimony to the effect that it was one of the worst seas they had ever encountered. There was confirmation of the character of the storm in the testimony of the Weather Bureau which is to the effect that on February 8th at 7 a. m. a disturbance was passing off Georgia and South Carolina. On the morning of the 9th reports of the shore stations showed that the winds were increasing rapidly in intensity and there was a rapid falling of the barometer. On February 10th a heavy comber boarded the port quarter and sprung the rudder head, and disconnected it from the steering gear. The schooner hove to and she rolled at 45 degrees. From 12 to 14 hours her decks were full of water and she could not be steered or guided as no repairs could be made until that time, because it was impossible for any of the crew to be on deck. Repairs were finally made so as to allow the vessel to hold her course for her destination. The vessel arrived at St. Thomas February 23d. On the way, the bilges were sounded from time to time; the pumps were used and worked properly. Large quantities of coffee and black water were discharged through the pumps. This indicated that the cargo below deck had been damaged. After the vessel put into St. Thomas under the custom of the Danish Law, surveyors were appointed to examine the vessel and cargo, and they reported as above indicated. We are satisfied that the vessel was seaworthy in every particular when she left Rio and that the damage by sea water was due to so severe a storm that it may be properly regarded as a peril of the sea and relieves the ship of liability. U. S. v. N. Y. & O. S. S. Company, 216 F. 61, 132 C. C. A. 305; In the Frey, 106 F. 323, 45 C. C. A. 309; and Davidson S. S. Co. v. 119,254 Bushels of Flaxseed (D. C.) 117 F. 284. The only evidence to the contrary is the opinion of experts called by the appellant who tell of the practice of drying wood which is used in a vessel and which was not the kind of dried wood used by the builders of this ship. But we think, in view of the testimony of other experts in the record, that this ship was constructed of properly seasoned wood and would not have leaked but for the unusual sea she encountered when she ran into this storm. We recognize that it is the duty of the carrier to sustain the burden of proof to show the connection of the damage by seawater and the exception against sea perils. The Folmina, 212 U. S. 354, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; The Rosalia (C. C. C.) 264 F. 285; The Thessaloniki (C. C. A.) 267 F. 67.

The bill of lading further provided:

"The carrier and its representatives are privileged in its or their discretion, if deemed advisable for the protection of the vessel or any cargo or to avoid loss, damage, delay, expense or other disadvantage or danger thereof, either with or without proceeding to or toward the port of discharge or entering or attempting to enter or discharge the goods there to proceed to any other port or ports or return to the port of shipment, once or oftener in any order of rotation, or keep the steamer in port or put into or remain at any port, or deviate from or change the advertised or intended route at any time or stage of the voyage retaining the goods on board or discharging the same at risk and expense of the owners thereof. * * *"

[4] This gave discretion in deviating from the usual course in making the voyage. Indeed, the circumstances which caused the delay in the voyage and required repairs to the sails left nothing else for the master to do in the exercise of a sound discretion. Tweedie Trading Company v. Clan Line Steamers, 207 F. 70, 124 C. C. A. 630. A "deviation" is a voluntary departure, without necessity or reasonable cause, of a voyage. Hostetter v. Park, 137 U. S. 40, 11 S. Ct. 1, 34 L. Ed. 568. It has no application here. Globe Navigation Company, Ltd., v. Russ Lumber & Mill Company (D. C.) 167 F. 228. Indeed, the deviation here was not only justified, but obligatory. The safety of the vessel justified it. We conclude that the calling at Barbadoes did not change the relations or the obligations of the schooner under the bill of lading.

It is said that the equipment which included dunnage to carry this particular cargo

was insufficient. We have referred to the dunnage above and find from the record nothing to justify the claim of the appellant in this respect. The credible testimony indicates clearly that the cargo was sufficiently dunnaged. The presence of sea water is sufficiently explained by the storm encountered on the voyage, and we deem it unnecessary to discuss further the possibility of water entering in other ways. It is plain ·that the water entered between the deck and the coamings. This was due to the pounding of the water, and the damage to the bottom tiers came from the filling of the vessel, which under the circumstances was to be expected. It may have come in because the waterway was open and perhaps parts of the sides. It is sufficient to say that the presence of the water resulted in the damage of the cargo due entirely to the storm of February 9th-10th. It did not require that the appellee point out principally how the water found its .way to the cargo. It will be excused on the ground of a sea peril, since we find no evidence justifying the claim that ·the vessel was unseaworthy. It follows that the decree must be affirmed.

Decree affirmed.